STEPHEN KOLITCH, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF ALAN KOLITCH, A MINOR, DECEASED, PLAINTIFF-RESPONDENT, v. STEFAN R. LINDEDAHL, ESTATE OF MARILYN BRADLEY AND JOHN A. BRADLEY, DEFENDANTS, AND STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

JOHN A. BRADLEY, AS ADMINISTRATOR AD PROSEQUENDUM FOR THE HEIRS-AT-LAW OF PHILIP M. BRADLEY, DECEASED, DAVID M. BRADLEY, DECEASED, AND MARILYN B. BRADLEY, DECEASED; AS ADMINISTRATOR OF THE ESTATES OF PHILIP M. BRADLEY, DECEASED, DAVID A. BRADLEY, DECEASED, AND MARILYN B. BRADLEY, DECEASED; AND INDIVIDUALLY, PLAINTIFF-RESPONDENT, v. STEFAN R. LINDEDAHL, DEFENDANT, AND STATE OF NEW JERSEY, DEPARTMENT OF TRANSPORATION, DEFENDANT-APPELLANT.

Argued March 4, 1985—Decided July 22, 1985.

*Benjamin Clarke,* Deputy Attorney-General, argued the cause for defendant-appellant (*Irwin I. Kimmelman,* Attorney-General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney-General, of counsel).

*Murry D. Brochin,* argued the cause for plaintiff-respondent Bradley (*Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor,* attorneys).

*Douglas T. Hague,* argued the cause for plaintiff-respondent Kolitch (*Wilentz, Goldman & Spitzer,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

These consolidated actions seek recovery on account of the wrongful deaths of plaintiffs' decedents, resulting from an automobile accident. The collision occurred on a State highway. The issue is whether the State is liable under the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3 (the Act). The trial court gave summary judgment in favor of the State, and the Appellate Division reversed. *Kolitch v. Lindedahl,* 193 *N.J.Super.* 540 (1984). Because of a dissent in the Appellate Division, the State's appeal is here as of right. *R.* 2:2–1(a). We reverse.

I

On October 31, 1978, at approximately 9:30 p.m., Stefan Lindedahl was driving his automobile in the southbound lane of Route 9W in Alpine, New Jersey. As Lindedahl entered a section of the roadway known as Walkers Hollow, his automobile went out of control and collided with another driven by Marilyn Bradley. Riding with Mrs. Bradley were her two sons, David and Philip, and a young neighbor, Alan Kolitch. All of the occupants of the Bradley car were killed.

Stephen Kolitch filed a wrongful death action on behalf of Alan in the Law Division, Bergen County, which was consolidated with a similar suit by John Bradley on behalf of Mrs. Bradley and the two boys. The complainants sought damages for various acts of negligence from Lindedahl, the Borough of

Alpine, the County of Bergen, and the State of New Jersey, *i.e.*, the State Department of Transportation.[1]

Plaintiffs claim that certain features of the roadway at the accident site amount to a dangerous condition within the Act's general liability section, *N.J.S.A.* 59:4-2. That section reads in full as follows:

> A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
>
> a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
>
> b. a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
>
> Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.

The asserted "irregularities" of the highway begin with those features that affect the sight distances, such as foliage, poor lighting, and worn curbing, but do not end there.[2] At Walkers Hollow the road is characterized by a "vertical sag curve." This is a technical term for a design in which, as applied to a roadway, a downgrade is followed by an upgrade, and the road surface between the two itself contains a curve along the horizontal plane. Pursuant to *N.J.A.C.* 16:28–1.123, the speed limit in the area of Walkers Hollow is 50 miles per hour, although when the road was originally built in 1925, the limit was considerably lower, namely, 30 miles per hour. Aside from this increase in the speed limit, the highway is unchanged from the way it appeared when it was first constructed. The core of

---

[1] The claims against the Borough of Alpine and the County of Bergen were disposed of in summary fashion in favor of both defendants and are not at issue in this appeal.

[2] Although throughout this opinion we refer to the condition at Walkers Hollow in the present tense, we were informed after oral argument that in fact an "alteration project" for the area was "substantially completed" in 1983.

plaintiffs' argument is that the posting of a 50 miles-per-hour sign within 200 feet of the curve created a dangerous condition of the roadway, or, to use their language, a "death trap" for unwary drivers.[3]

At the trial level the State asserted its immunity under various provisions of the Act, including plan and design immunity, *N.J.S.A.* 59:4–6; discretionary immunity, *N.J.S.A.* 59:2–3; and immunity for failing to provide ordinary traffic signals, *N.J.S.A.* 59:4–5. It also denied liability for having failed to post emergency signals under *N.J.S.A.* 59:4–4, and argued that its activities did not result in a dangerous condition of the roadway under *N.J.S.A.* 59:4–2. More specifically, the State's position is that it cannot be held liable for the posting of a sign that does nothing more than inform the travelling public of the correct limit. The State also asserts that the setting of the limit in the first instance is a discretionary function and therefore protected under *N.J.S.A.* 59:2–3(b), which states: "[a] public entity is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature." The gist of the State's contention, then, is that it cannot be a tort for a public entity or employee to inform the public of a duly promulgated discretionary determination.

---

[3]The plaintiffs' expert submitted an affidavit at the trial level in which he explained:

> On a highway such as Route 9W, it is both reasonable and prudent for a driver to accelerate as rapidly as the existing traffic and weather conditions will allow to reach the speed at which other traffic is flowing or is expected to flow because of the risk that other traffic will come upon the slower moving vehicles unexpectedly without adequate opportunity to slow or stop. Therefore, the posting of a speed limit of 50 miles an hour on a roadway such as Route 9W can be expected to have the effect of encouraging drivers entering the roadway to bring their vehicles to that speed as soon as possible.

\* \* \* \* \* \* \* \*

> It is generally considered that the posting of any given speed limit gives rise to a belief on the part of the driver that the road can be traversed safely at such speeds.

The trial court concluded that the various immunity provisions of the Act were dispositive of plaintiffs' claims. ·On appeal the Appellate Division agreed with the State on its plan and design immunity, but reversed, over a dissent by Judge Fritz, on the issue of whether a dangerous condition had been created under the Act's general liability section, *N.J.S.A.* 59:4–2. The court below reasoned that the State would not be immune from liability for a dangerous condition of the roadway were a jury to determine that such a condition existed as the result of an operational (as opposed to a planning-level) decision to post the speed-limit sign within close proximity to the curve itself. Judge Fritz dissented on the limited issue of whether liability could be imposed under *N.J.S.A.* 59:4–2.

## II

Although immunity under the common law has been cut back or in some jurisdictions eliminated completely, this Court made clear in *Willis v. Department of Conservation & Economic Dev.*, 55 *N.J.* 534 (1970), that actions of a legislative or judicial nature should still be immune from suit.[4] As the Court there stated:

> It is time for the judiciary to accept * * * responsibility and adjudicate the tort liability of the State itself. * * * [W]e will not attempt to express an ultimate doctrine; the constituent principles will be better evolved out of the realities of specific cases. But we do emphasize that the State will not be liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial cast, nor generally with respect to decisions calling for the exercise of official judgment or discretion.
>
> [*Id.* at 540.]

---

[4]For a broader look at the historical origins of governmental immunity, see 1 F. Pollock and F. Maitland, *The History of English Law* 515 (2d ed. 1952); E. Borchard, "Governmental Liability in Tort," 34 *Yale L.J.* 1 (1924); A. Van Alstyne, "Governmental Tort Liability: A Decade of Change," 1966 *U.Ill.L.Forum* 919 (1966); J. Henderson and R. Pearson, *The Torts Process* 620 (2d ed. 1981); W. Prosser and W.P. Keeton, *The Law of Torts* § 1341 at 1032–33 (5th ed. 1984).

Following the decision in *Willis* the Attorney General completed an exhaustive review of the law in this area and made extensive recommendations for change.[5]  The New Jersey Tort Claims Act, which stems from these recommendations, became effective on July 1, 1972, and carries the following legislative declaration:

> [I]t is hereby declared to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein.  All of the provisions of this act should be construed with a view to carrying out the above legislative declaration.
>
> [*N.J.S.A.* 59:1–2.]

The statute is therefore unmistakably clear in providing that liability on the part of the State cannot be imposed unless consistent with the entire Act itself.  *See Bell v. Bell,* 83 *N.J.* 417 (1980); *McGowan v. Borough of Eatontown,* 151 *N.J.Super.* 440 (App.Div.1977).

### III

■ To recover under *N.J.S.A.* 59:4–2, the Act's general liability section, a plaintiff must show that the property was in a dangerous condition at the time of the injury; that the injury was proximately caused by the dangerous condition; that the dangerous condition created a reasonably foreseeable risk of the kind of injury that was incurred; and that a public employee created the dangerous condition or that the public entity had notice in time to protect against the condition itself.  *Brown v. Brown,* 86 *N.J.* 565, 575 (1981); *N.J.S.A.* 59:4–2.  Additionally, there can be no recovery unless the action or inaction on the

---

[5]The Attorney-General was authorized by the legislature to begin his study on immunity in 1966, some four years before the decision in *Willis.* See *N.J.S.A.* 52:17B–4.1.  However, in light of *Willis* and another decision abolishing the State's immunity in contract actions, *P, T & L Construction Co. v. Commissioner of Transp.,* 55 *N.J.* 341 (1970), Attorney-General Kugler stated that "a more intensive examination of the subject was required." *Report of the Attorney General's Task Force on Sovereign Immunity* (1972), at 1.  Thus, the Kugler Report is a product of both the Court's decision in *Willis* and an earlier legislative mandate.

part of the public entity in protecting against the condition was "palpably unreasonable," a term nowhere defined in the Act.

■ For today's purposes we accept what was stated in *Williams v. Phillipsburg,* 171 *N.J.Super.* 278, 286 (App.Div. 1979), in which the court differentiated the term "palpably unreasonable" from ordinary negligence:

> We have no doubt that the duty of ordinary care, the breach of which is termed negligence, differs in degree from the duty to refrain from palpably unreasonable conduct. The latter standard implies a more obvious and manifest breach of duty and imposes a more onerous burden on the plaintiff.

We conclude that the term implies behavior that is patently unacceptable under any given circumstance. As one trial court has suggested, for a public entity to have acted or failed to act in a manner that is palpably unreasonable, "it must be manifest and obvious that no prudent person would approve of its course of action or inaction." *Polyard v. Terry,* 148 *N.J.Super.* 202, 216 (Law Div.1977), *rev'd* on other grounds, 160 *N.J.Super.* 497 (App.Div.1978), *aff'd* o.b., 79 *N.J.* 547 (1979); *see also* H. Margolis and R. Novack, *Tort Claims Against Public Entities* 55 (1984) (discussing *Williams* and *Polyard*). Moreover, the burden of proof with regard to the palpable unreasonableness of the State's action or inaction is on the plaintiff in a case of this type. *Fox v. Township of Parsippany-Troy Hills,* 199 *N.J.Super.* 82 (App.Div.), certif. den., — *N.J.* — (1985); H. Margolis & R. Novack, *supra,* at 54; Comment, "The N.J. Tort Claims Act: A Step Forward?", 5 *Seton Hall L.Rev.* 284, 294 (1974).

Of the four essential elements of the plaintiffs' cause of action, only one, the existence of a dangerous condition, was discussed in any detail by the courts below. The term itself is defined in *N.J.S.A.* 59:4-1, which states:

> "Dangerous condition" means a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used.

Moreover, courts have defined a "substantial risk" as "one that is not minor, trivial or insignificant." See *Polyard v. Terry, supra,* 160 *N.J.Super.* at 509. In *Polyard,* the Appellate

Division further stated that "[e]ach case where the issue arises must be pragmatically examined by the judge, to determine whether the particular highway irregularities were such that reasonable minds could differ as to whether they manifested that the highway was in a dangerous condition." *Id.* at 510.

■■■ Applying the foregoing principles to this case, we agree with the State that it cannot be a tort to communicate accurately a properly established speed limit. We also agree that the setting of the speed limit in the first instance is a discretionary function. In the pre-Act case of *Fitzgerald v. Palmer*, 47 *N.J.* 106, 109–10 (1966), this Court stated, "[w]hether a road should have * * * traffic lights, or traffic policemen, or a speed limit of 50 or 60 miles per hour—such matters involve discretion and revenue and are committed to the judgment of the legislative and executive branches." Moreover, in *N.J.S.A.* 39:4–98 the legislature has specifically empowered the Commissioner of Transportation to "designate a reasonable and safe speed limit" under certain circumstances, an exercise of discretion under a specific legislative delegation.

The dissent suggests that the "lawful" speed limit at Walkers Hollow is not 50 miles per hour, the currently posted limit there, but rather the speed only at which the curve itself may be traversed safely—that a "reduced speed in fact *is* the lawful" speed. *Post* at 507. (emphasis in original). This ingenuously contrived proposition provides the convenient springboard for the remarkable conclusion that the posted sign "did *not* accurately communicate the lawful speed limit applicable to the stretch of road in question." *Post* at 499. (emphasis in original).

The dissenter's point, so persuasively made, misconstrues the statutory and administrative provisions that govern this case. That the speed limit in the vicinity of Walkers Hollow is 50 miles per hour cannot be disputed. See *N.J.A.C.* 16:28–1.123. Moreover, *N.J.S.A.* 39:4–98 empowers the State Highway Commissioner to erect and maintain "signs or billboards at such

points of entrance to the State as are deemed advisable, setting forth the lawful rates of speed * * *." Significantly, the predecessor to *N.J.S.A.* 39:4–98 contained the following provision regarding unsafe movement: "In any case where any such [designated] speed would be unsafe it shall not be lawful." *L.* 1939, *c.* 211, § 1. That provision was removed from the statute in 1951, *see L.*1951, *c.* 23, § 55, at which point the following was added:

> The driver of every vehicle shall, consistent with the requirements of this section, drive at an appropriate reduced speed when approaching and crossing an intersection or railway grade crossing, *when approaching and going around a curve,* when approaching a hill crest, when traveling upon any narrow or winding roadway, and when special hazard exists with respect to pedestrians or other traffic or by reason of weather or highway conditions. [Emphasis added.]

This latter provision remains today. See *N.J.S.A.* 39:4–98.

These statutory changes make it unmistakably clear that the "lawful" limits of speed are simply those that are posted, namely, those limits above which a motorist using our roadways will be held to be in violation of the traffic regulations. In the case before us that limit is 50 miles per hour, precisely that which is communicated by the posted sign. The onus of reducing speed to some appropriate level when approaching a curve such as the one at Walkers Hollow is on the driver. Thus, the State cannot be subjected to liability for the posting of a sign so long as the sign itself does not misinform the public with regard to the actual, lawful limit as permitted by statute and as enforced by the appropriate officials.

In this connection we recognize as it relates to this case that there is a distinction to be made between a planning-level or discretionary decision, which is generally entitled to immunity, and an operational or ministerial action, which is not. See *N.J.S.A.* 59:2–3; *Costa v. Josey,* 83 *N.J.* 49, 58–60 (1980). As one court has explained, "[a] discretionary act * * * calls for the exercise of personal deliberations and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and *acting on them* in a way not specifically directed." *Miree*

*v. United States*, 490 *F.Supp.* 768, 774 (N.D.Ga.1980) (emphasis added). We believe that the posting of a sign is merely one form of *acting* on the decision to set a certain limit, a decision that is discretionary in nature and therefore entitled to immunity. Thus, both the decision and the act of implementation are one and the same for the purposes of the statute. Even if this were not the case, the posting of a sign that does nothing more than inform the public of the lawful speed limit could hardly be viewed as "palpably unreasonable" within the meaning of that term as used in the Act.

Nor is the State liable for its failure to warn of the hazardous nature of the curve itself. In *Aebi·v. Monmouth County Highway Dep't*, 148 *N.J.Super.* 430 (App.Div.1977), the plaintiff was injured, and another driver killed, on a county-owned bridge that was considerably narrower than the road on which it was located. The plaintiff sought to predicate liability on the basis that the county had failed to warn motorists "that the width of the roadway was being suddenly reduced to the width of the bridge." *Id.* at 432. In rejecting that argument the court relied on *N.J.S.A.* 59:4–5, which provides:

> Neither a public entity nor a public employee is liable under this chapter for an injury caused by the failure to provide ordinary traffic signals, signs, markings or other similar devices.

In interpreting this provision, the court concluded: "The determination as to the advisability or necessity of a traffic sign or warning device at any particular place requires the exercise of discretion, and hence *N.J.S.A.* 59:4–5 simply specifies one particular type of discretionary activity to which immunity attaches." *Id.* at 433.

Likewise, in *Johnson v. Township of Southampton*, 157 *N.J.Super.* 518 (App.Div.), certif. den., 77 *N.J.* 485 (1978), a motorcycle rider was seriously injured when he smashed into a guardrail at a "T" intersection that was unmarked and partially obstructed by trees and other vegetation. The court held that by virtue of *N.J.S.A.* 59:4–5 the municipality was immune from liability for its failure to have marked the intersection. The

court also concluded: "The limited ability to make observations on either side of the road caused by trees and vegetation simply served as a warning that due care must be maintained." *Id.* at 523.

Finally, we have considered the additional points raised in plaintiffs' briefs and are satisfied that they were correctly resolved by the courts below. In particular, we agree that insofar as the "sag curve" could be considered to be a dangerous condition, that condition is insulated by the provisions of *N.J.S.A.* 59:4–6, granting immunity for construction in accordance with approved plan or design. We agree, as well, that the public entity could not be held liable for failure to provide "emergency signals, signs, markings or other devices" under *N.J.S.A.* 59:4–4. We have considered these points despite the fact that they are not properly before us on this appeal, there having been no dissent below on those issues, *see R.* 2:2–1(a)(2), and no petition for certification that raised those additional points, *see R.* 2:2–1(b); *cf. State v. Del Fino*, 100 *N.J.* 154, 165 (1985) (Court would not consider grounds urged for reversal of conviction when not addressed by Appellate Division and not the subject of a grant of certification).

## IV

It is well established that the burden is on the public entity both to plead and prove its immunity under our Act, *see Ellison v. Housing Auth. of South Amboy*, 162 *N.J.Super.* 347, 351 (App.Div.1978); and that to succeed on a motion for summary judgment, the entity must "come forward with proof of a nature and character [that] would exclude any genuine dispute of fact * * *." *Id.* However, once a moving party has met that burden, summary judgment is warranted and, indeed, desirable, as a matter of judicial economy. *See Judson v. Peoples Bank & Trust Co. of Westfield*, 17 *N.J.* 67, 74 (1954);

*R.* 4:46–2; *cf. Sutphen v. Benthian,* 165 *N.J.Super.* 79, 82 (App. Div.1979) (summary judgment "entirely unwarranted"; defendant's conduct "clearly not the type of high-level policy decision contemplated by * * * the Tort Claims Act"). In light of the provisions discussed above, the State has met its burden in this case and is therefore entitled to prevail.

The judgment of the Appellate Division is reversed. The cause is remanded to the Law Division for entry there of judgment in favor of defendant State of New Jersey.

O'HERN, J., concurring.

It would be less than candid not to admit how close is the call in this case. Justice Handler's compelling dissent points out how contradictory are the signals of the Tort Claims Act. The liability that the Act concedes for a dangerous condition of property under *N.J.S.A.* 59:4–2 is withdrawn when the condition is caused by an immune act such as the design of the road, *N.J.S.A.* 59:4–6, or the legislative determination of the proper speed limit. *N.J.S.A.* 59:2–3(b).

The bitter irony is that the very posting of the immune legislative statement may have contributed to this fatal accident. Indeed, the posted speed may have conflicted with other speed control laws. Yet the comment to *N.J.S.A.* 59:2–1 makes clear that the statute is "intended to insure that any immunity provisions provided in the act or by common law will prevail over the liability provisions." Immunity is the dominant consideration of the Act. *See, e.g., Malloy v. State,* 76 *N.J.* 515, 518–19 (1978).

The conflicting interplay of the provisions of the Act in this case may present one of those rare occasions that will commend itself to consideration as a legislative claim. *See P, T & L Const. Co. v. Comm'r Dept. of Trans.,* 55 *N.J.* 341, 342 (1970).

HANDLER, J., dissenting.

As a general proposition, I agree with the Court that "it cannot be a tort [for the Department of Transportation (DOT or State)] to communicate accurately a properly established speed limit." *Ante* at 494. This proposition, however, is not inconsistent with a theory of liability proposed by plaintiffs in this litigation. Plaintiffs' evidence suggests the existence of a dangerous condition involving a posted sign that did *not* accurately communicate the lawful speed limit applicable to the stretch of road in question. Plaintiffs also offer to prove the inapplicability of any immunities that might otherwise be available as a defense against their claim. I would therefore affirm the Appellate Division's decision, which reversed the trial court's summary judgment against the plaintiffs. Accordingly, I dissent.

I.

My differences with the majority are narrow but important. They proceed from a different application of the subtle and intricate provisions of the Tort Claims Act to the circumstances of this case. A complete exposition of the facts is therefore necessary to understand why, in my opinion, plaintiffs have established a valid cause of action that is not barred by the statutory doctrine of sovereign immunity.

Just after 9:30 p.m. on Halloween night in 1978, Marilyn B. Bradley was driving her family's 1973 Opel northbound on Route 9W in the Borough of Alpine. Riding with her in the car were her twin 11-year-old sons, David and Philip Bradley, and an 11-year-old neighbor boy, Alan Kolitch. At about the same time, 22-year-old Stefan R. Lindedahl turned his 1969 Pontiac southbound on the same road. He had approached Route 9W from Hillside Avenue, entering at the "T" intersection between the two roads. Lindedahl accelerated to reach what he thought was the speed limit of 50 mph because, in his words, he feared "traffic coming up behind" his vehicle.

Between the Bradley vehicle and the point where Lindedahl entered Route 9W is a section of roadway known as Walkers Hollow. This two-lane stretch of asphalt traverses a vertical sag curve. Such a curve is characterized by a downgrade that is followed by an upgrade, where the intersection between the two itself curves along the horizontal plane. Lindedahl had not driven in the area often enough to recall this combination of curve and dip in the roadway and saw only one sign in the 200 feet between Hillside Avenue and Walkers Hollow: a 50 mph speed limit sign.

In testimony describing his approach to Walkers Hollow, Lindedahl has stated that the road was "very dark," without streetlights, and that the curve came up "suddenly, very suddenly." He saw no signs indicating that there would be a curve ahead, no signs indicating that he should lower his speed from 50 mph before reaching the curve, no signs indicating that there was limited sight distance in the curve, and no reflectors lighting his path. Although there were painted lines in the center of the roadway and along the sides of the lanes, other factors that could have helped delineate the boundaries, nature, and risks of the curve-and-dip at Walkers Hollow were obscured by inadequately trimmed foliage and vegetation.

Lindedahl has described what happened when he drove into the curve-and-dip of Walkers Hollow:

> There was no warning sign of an impending curve coming up and when I realized I was in the curve I shifted my foot from the gas to the brake pedal. By now I was realizing the car was going out of control. I fought the steering wheel and the car seemed to veer very quickly from side to side, a left to right to left motion. On the return left I totally lost control and crossed the center dividing lines. At this time I saw the Bradley car and we crashed immediately thereafter. Everything thereafter was foggy until I 'woke up' at the hospital.

The occupants of the other car were not so fortunate. Marilyn Bradley apparently could not see the Lindedahl vehicle in time to take evasive action, as she maintained her position in her lane. She and the three children riding with her died in the head-on collision, or very shortly thereafter.

Plaintiffs offer evidence that this crash should be attributed to DOT's having posted a 50 mph sign just before the Walkers Hollow curve and dip. According to their expert,

[i]t is not simply the design of the road in the area of Walkers Hollow that proximately caused the accident in question. Had the road been signed for the actual designed safe speed of 20–30 miles per hour, with adequate maintenance of the roadway's environs to delineate the curve at a distance sufficient to permit a driver to react accordingly, it is my judgment that it is reasonably likely that this accident would not have occurred or its severity would have been mitigated.

It is not simply the absence of warning signs before the Walkers Hollow vertical sag curve that proximately caused the accident. *To the contrary, it is reasonably likely that it is because there were signs, for a speed of 50 miles an hour, that the driver of the other car was misled into believing that he could safely traverse the curve at that higher speed.*

In short, it is a combination of circumstances peculiarly within the control of the * * * [DOT] that created the conditions that resulted in the accident. Those circumstances include a significant alteration in the as-designed nature of the road by increasing the speed limit beyond all bounds of reasonableness, the failure to maintain the road and its environs so as to preserve whatever limited sight distance the geometrics permitted, the failure to warn of a dangerous condition and the *active deception of the traveling public by posting a speed limit far in excess of the actual safe speed of the road.* In the aggregate, these circumstances constitute a gross deviation from the appropriate standard of care and are, in my judgment, palpably unreasonable. (Emphasis added.)

The expert further explained how the maximum safe speed of the roadway at Walkers Hollow would be dictated by the actual characteristics of the vertical sag curve. He concluded that if the speed limit were 40 mph, then the minimum length of the vertical curve should have been 600 feet; if it were 50 mph, the minimum length should have been 1400 feet. In fact, however, the curve ran for only 242 feet, and the expert concluded that "[u]nder no circumstances would a speed in excess of 30 miles an hour have been consistent with design of that section of the roadway." [1]

---

[1] The expert elaborated on the need for an appropriate length of sight distances in the curve at Walker's Hollow.

The importance of this distance arises from the fact that there is a finite time period within which a human being is capable of reacting to an external condition. One must be able to correlate that time period with

## II.

In suits against a state agency, such as DOT, plaintiffs alleging negligence must first establish the predicates for liability, and later avoid application of any provision granting the sovereign immunity. *See N.J.S.A.* 59:2–1. The statutory scheme recognizes that immunity from tort liability is a species of affirmative defense, which can excuse responsibility for tort without negating the existence of fault. *See P, T & L Construction Co. v. Commissioner, Department of Transportation,* 55 *N.J.* 341 (1970); *see also Merenoff v. Merenoff,* 76 *N.J.* 535, 547–48 (1978) (describing scope of the same general proposition); *accord W. Prosser & W. Keeton, The Law of Torts* 1032 (5th ed. 1984) (Prosser & Keeton). It is also important to understand that the State's immunity from the consequences of its tortious conduct is neither absolute nor immutable. *See, e.g., Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes,* 90 *N.J.* 582 (1982); *Brown v. Brown,* 86 *N.J.* 565 (1981); *Costa v. Josey,* 83 *N.J.* 49 (1980); *Schriger v. Abraham,* 83 *N.J.* 46 (1980).

In this case, plaintiffs predicate their cause of action on the unsafe condition of public property. The law governing such claims provides that:

A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition,

the person's ability to take corrective action in the event that the need arises. For example, one must be able to see a hazard, recognize that it in fact poses a danger and take appropriate action far enough in advance to avoid the hazard. In general, that reaction time is generally 1.5 seconds. In that period, however, a vehicle traveling at 50 miles an hour will cover a greater distance than one traveling at 30 miles an hour. While both drivers will have the same time period in which to react, the driver of the faster car will be upon the hazard sooner than the driver of the slower vehicle * * *. [The need for length is exacerbated by] the geometrics of Route 9W in the area of Walkers Hollow and because of conditions of darkness, tree canopy, inadequate signing, overgrown foliage, inadequate curbing and the like.

that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

    a.   a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

    b.   a public entity had actual or constructive notice of the dangerous condition under section 59:4–3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.

[*N.J.S.A.* 59:4–2.]

This Court has recognized that liability based on these provisions requires a demonstration that (1) a dangerous condition of public property (2) proximately caused plaintiff's injury (3) in a way that was reasonably foreseeable (4) after the entity in charge of the property either had notice in time to protect against the condition or had created the condition by an employee acting within the scope of employment; further, the agency's action or inaction must be "palpably unreasonable." *Brown, supra,* 86 *N.J.* at 565.

The key phrase, "dangerous condition," is defined in *N.J.S.A.* 59:4–1(a).

"Dangerous condition" means a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used.

A "substantial risk" giving rise to a dangerous condition is "one that is not minor, trivial or insignificant." *Polyard v. Terry,* 160 *N.J.Super.* 497, 509 (App.Div.1978), aff'd o.b., 79 *N.J.* 547 (1979). A plaintiff must advance enough facts to enable a jury of reasonable people to find that the condition was dangerous. *Id.* at 510.

In this case, substantial evidence was offered to prove that a dangerous condition existed. One aspect of the evidence is that, in the 25 years prior to the Bradley collision, there had been 330 accidents, causing 199 injuries and 31 deaths, in a distance of one mile along Route 9W near the scene of the collision. Of those accidents, 110 had been at Walkers Hollow itself, resulting in 63 injuries and 13 deaths. Notwithstanding

these facts, the trial court concluded that plaintiffs "failed to demonstrate that the risk was 'substantial'." The majority in the Appellate Division disagreed, reasoning that the State had created "a dangerous condition of the 200 foot stretch of roadway for motorists travelling at the posted speed limit, as the result of the 'vertical sag curve' in Walkers Hollow in combination with a misleading speed limit sign and poor visibility." I think it indisputable that the history of accidents, injuries, and deaths at Walkers Hollow constitutes evidence from which it could fairly be inferred that a "condition of the property" created a substantial risk of harm. *Cf. Brown, supra,* 86 *N.J.* at 570–71 (16 accidents over three years in one stretch of road led to a concession by the State that a "very hazardous" dangerous condition existed).

A second aspect of the evidence of the dangerous condition relates to the placement of a 50 mph sign just before the sag curve. The trial court did not consider this factor; it focused attention solely on the changing contour and twisting course of the road in determining whether a dangerous condition was caused by DOT's action. This limited evaluation was incomplete because it failed to appreciate that plaintiffs' claim of a dangerous condition was based on the unsafety of the presence of the speed-limit sign *in relation to* the curve and dip, as well as the history of prior accidents. In my view (and on this point I perceive no difference from the majority), plaintiffs properly focus on both the road's configuration and the sign's location. *See Lytle v. City of Newark,* 166 *N.J.Super.* 191, 195 (Law Div. 1979) ("in determining whether a dangerous condition exists, the court must consider the * * * streets and the traffic * * * [control devices] as one unit making up the municipal property referred to in the statute").

It is consistent with the intent underlying the Tort Claims Act to consider the placement of the 50 mph sign just before Walkers Hollow in determining whether a dangerous condition existed. The Legislature must have contemplated such an application of this statutory provision, because if it were not intended that signs could be part of the condition of public

property, then the Legislature would not, in creating the special immunity from liability in *N.J.S.A.* 59:4–5, have limited that immunity only to the *failure* to post signs. Had the legislators so desired, they could easily have drafted that same provision to immunize the affirmative decision to place a sign. Thus, as the Appellate Division recognized, if a sign is posted on public property, it should be considered an attribute, feature, or condition of that property; there should be liability if in fact the sign's placement is so dangerous as to create a risk of injury from the foreseeable normal use of the property. *Kolitch v. Lindedahl*, 193 *N.J.Super.* 540, 547–48 (1984); *accord Lytle v. City of Newark, supra.* The same result is approved in several decisions interpreting the California Tort Claims Act.[2] *E.g., Harland v. State*, 75 *Cal.App.*3d 475, 142 *Cal.Rptr.* 201, 206 (1977) (posted sign setting excessive speed limit contributed to dangerous condition); *Teall v. City of Cudahy*, 60 *Cal.*2d 431, 434, 34 *Cal.Rptr.* 869, 871, 386 *P.*2d 493, 495 (1963) (Traynor, J.) (in the face of an immunity claim by the State, sent case to trial based on plaintiff's allegation that "active deception" due to the placement of a traffic control device created a dangerous condition); *De La Rosa v. City of San Bernadino*, 16 *Cal.App.*3d 739, 746, 94 *Cal.Rptr.* 175, 179 (1971) (faded "stop ahead" sign contributed to dangerous condition); *Bakity v. County of Riverside*, 12 *Cal.App.*3d 24, 90 *Cal.Rptr.* 541, 545 (1970) (location of stop sign contributed to dangerous condition).[3]

---

[2]"We often look to interpretations of the California Tort Claims Act * * * for guidance in construction of our own statute." *Birchwood Lakes, supra,* 90 *N.J.* at 595.

[3]The dangerous placement of a misleading sign, which the state controls, differs substantially from the presence of dangerous person or animal on state property, which may be unpreventable given the State's vast land holdings. *Rodriguez v. N.J. Sports & Exposition Auth.*, 193 *N.J.Super.* 39 (App.Div.1983) (presence at a racetrack of persons with a criminal intent is not a "dangerous condition"); *Cogsville v. Trenton*, 159 *N.J.Super.* 71 (App.Div.1978) (a vicious dog that bites an infant on a public street is not a "dangerous condition"); *Setrin v. Glassboro State College*, 136 *N.J.Super.* 329 (App.Div.1975) (criminal conduct on the part of a student at a state college is not a "dangerous condition").

Within this analytic framework, plaintiffs' evidence supports their claim that the posted speed limit sign created a "dangerous condition" as defined by *N.J.S.A.* 59:4–1(a). According to the proffered evidence, drivers could and did rely on the sign, believing they were driving with "due care" in accordance with the posted speed limit. Further, it was "reasonably foreseeable" that the road would be travelled in this manner. Their expert testified that "it is reasonably likely that it is because there were signs, for a speed of 50 miles an hour, that * * * [Lindedahl] was misled into believing that he could safely traverse the curve at that speed." The expert concluded that this "active deception" contributed to the risk at Walkers Hollow in a predictable way.

In addition, if the history of prior accidents and placement of the 50 mph sign were not enough to constitute proof of a dangerous condition, plaintiffs' evidence is probative of the proposition that the 50 mph sign at Walkers Hollow stated a speed-limit in *violation* of applicable statutory standards. In *N.J.S.A.* 39:4–98 the Legislature established a presumptive maximum speed limit of 50 mph applicable on all New Jersey roads. This provision is qualified, however, by the legislative mandate that along certain portions of state roads, drivers must slow down. *N.J.S.A.* 39:4–98 specifically requires that

[t]he driver of every vehicle shall * * * drive at an appropriate reduced speed when * * * approaching and going around a curve, when approaching a hill crest, when travelling upon any narrow or winding roadway, and when special hazard exists with respect to pedestrians or other traffic or by reason of weather or highway conditions.

Thus, although this statute also authorized DOT to set particular maximum speed limits for any stretch of road on a case-by-case basis—as done, for example, by *N.J.A.C.* 16:28–1.123(a) to govern Route 9W—it is clear that the power to authorize the placement of a particular speed-limit sign is governed by the statutory mandate of *N.J.S.A.* 39:4–98 that requires driving at reduced speeds along certain areas of highway. The lawful speed limit on such stretches of road *must be less* than the

maximum speed limit that might otherwise be authorized by general statute or regulation.

The evidence in the case strongly suggests that the configuration of the road at Walkers Hollow should trigger the statutory requirement for "an appropriate reduced speed." Crediting that evidence as we must on this review of summary judgment, that reduced speed in fact *is* the lawful speed-limit; the posted 50 mph speed would surely exceed that "appropriate reduced speed" and plainly be inconsistent with it. Under this analysis of the facts, the posted speed-limit would be contrary to the operative statute.

Because plaintiffs alleged that the State through its employees created the dangerous condition, they do not have to show that the State had "adequate notice" of the condition under *N.J.S.A.* 59:4–2(b). Nevertheless, the evidence demonstrates that DOT knew that the combination of the curve and dip, the traffic density, and the posted speed posed a substantial risk of injury to the motorists using Route 9W. Alpine town officials and residents had repeatedly written the agency specifically complaining about the hazards of the Walkers Hollow curve.[4]

---

[4]Ironically, plaintiff John A. Bradley wrote one such letter on June 18, 1975. It reads, in part:

> It is clear to me that [the DOT has] * * * not * * * investigat[ed] * * * the road area from Rio Vista south of Hillside Avenue and to Glen Goin, north of Hillside Avenue. This stretch of road has claimed several lives since I moved to Alpine and particularly associated with the dip known as Walker's Hollow, 200 feet south of Hillside Avenue on Route 9W. *I explained all of this to * * * [a named state official] and he stated that this would be the subject of a further study.* This road area is poorly marked, lighted and contained several other hazards, including access to driveways, poorly placed utility poles, [and] a hazardous dip and curve. Trees and rocks obscure vision and little or no speed monitoring is done by the town, county or state * * *. I would first ask for a more thorough plan from your department and one that includes the dip at Walkers Hollow. (Emphasis added.)

Thus, not only did the DOT know of the hazards, but plaintiff, allegedly, had been promised some remedial action over three years before the death of his wife and children.

Indeed, plaintiffs allege that plans had been underway "for about a year or so prior to this accident" to upgrade and improve Route 9W, with particular emphasis on the sign distances.[5] Thus, DOT was aware of the high risk to travellers through Walkers Hollow for a sufficient period "to have taken protective measures" against the dangerous condition.

This evidence bears materially on an additional requirement in *N.J.S.A.* 59:4–2, namely, that the State's challenged action, or inaction, be "palpably unreasonable." Tortious conduct will be considered palpably unreasonable if it is "manifest and obvious that no prudent person would approve of * * * [the] course of action or inaction." *Polyard v. Terry*, 148 *N.J.Super.* 202, 216 (Law Div.1977), rev'd on other grounds, 160 *N.J.Super.* 497 (App.Div.1978), aff'd o.b., 79 *N.J.* 547 (1979). Plaintiffs' evidence fairly presents a genuine issue as to whether the culpability involved in DOT's placement of the maximum speed-limit sign, as well as its failure to take corrective measures to eliminate this danger, was sufficiently egregious to meet the statutory standard of being palpably unreasonable. Ultimately, it is for the jury to determine whether palpably unreasonable action has occurred. *Brown, supra,* 86 *N.J.* at 580.

In sum, plaintiffs' evidence, considered sympathetically in the context of a motion for summary judgment, was adequate to demonstrate an affirmative cause of action against the State under the Tort Claims Act. It was sufficient to enable a trier of fact to conclude that the State had created a dangerous condition at Walkers Hollow on Route 9W that was palpably unreasonable within the intendment of *N.J.S.A.* 59:4–2.

---

[5]In *Brown, supra,* 86 *N.J.* at 578, we recognized that if DOT had previously "agreed that the road condition was dangerous, that the highway was under its control, that it was aware of the precarious situation, and that it intended to take corrective measures," then liability might attach if the agency assigned too low a priority to this site for repair.

### III.

Independent of plaintiffs' affirmative case, DOT claims immunity under the Tort Claims Act against any cause of action based on evidence that the placement of a 50 mph speed limit sign near Walkers Hollow created a dangerous condition. In my view the evidence in this case is not sufficient to establish these immunities and defeat plaintiffs' cause of action as a matter of law.

### A.

The State initially observes that the Legislature has authorized DOT to set a speed limit for Route 9W. See *N.J.S.A.* 39:4–98. DOT also points out that it properly promulgated regulations establishing the maximum speed limit at 50 mph on the stretch of road traversing Walkers Hollow. See *N.J.A.C.* 16:28–1.123. DOT correctly concludes that the State is immune from any suit based on either enactment of the speed-limit statute or the speed-limit regulation, because that the Tort Claims Act provides that "[a] public entity is not liable for * * administrative action or inaction of a legislative or judicial nature." *N.J.S.A.* 59:2–3(b). However, DOT also asserts that *N.J.S.A.* 59:2–3(b) immunizes any decision to post signs that simply identify or communicate the speed limit authorized by the enactments, no matter where the signs are posted.[6]

---

[6]The immunity defense based upon legislative action in the context of this case is conceptually related to another form of immunity, namely, that based on plan or design provided by *N.J.S.A.* 59:4–6. *See Fitzgerald v. Palmer*, 47 *N.J.* 106, 109–110 (1966). In this case, however, plaintiffs do not contend that they are entitled to challenge the State's original decision to authorize a speed-limit of 50 mph as that may arguably be considered an aspect of the design and plan for this road. Rather, they assert that the decision to place an actual speed-limit sign at the Walkers Hollow site is a decision independent from the highway's original design or plan. Indeed, DOT does not appear to argue that the original legislative authorization of the 50 mph speed limit itself triggers plan or design immunity under *N.J.S.A.* 59:4–6. The State recognizes that this immunity is not directly relevant to the charge of negligence in the actual placement of the particular speed limit sign at the specific location on the road.

This last argument fails to recognize the nature of the sign-selection and sign-posting procedure. DOT's regulations delegate to the Chief of the Bureau of Traffic Engineering (Bureau Chief) the responsibility for posting speed limit signs. *N.J.A.C.* 16:27–2.2. This task differs markedly from the initial decision to set the maximum speed limit. Precise standards derived from a manual printed by the federal government govern these decisions, and no public policy formulation appears to be entailed in any particular sign-posting decision. *N.J.A.C.* 16:27 (Forward). These administrative actions are thus far removed from their legislative origins by layers of subdelegation. In addition, the evidence that informs this administrative decision is derived from ordinary field investigations, an information-gathering process quite different from that entailed in either administrative adjudication or rule-making. Thus, the determination by the Bureau Chief to authorize a particular speed-limit sign involves simply the implementation of previously established public policy reflected in enacted statutes and regulations. It is an action that partakes more of executive than judicial or legislative authority. Consequently, the decision to place the speed-limit sign should not be protected under *N.J.S.A.* 59:2–3(b).[7]

---

Consequently, it concentrates on the claim for immunity on the legislative character of its actions under *N.J.S.A.* 59:2–3(b).

[7]DOT regulations further provide that the Chief of the Bureau of Engineering must expressly authorize all placement or changes of street signs. *N.J.A.C.* 16:27–2.3. If a speed limit sign was posted at Walkers Hollow without approval of the Bureau Chief, the actions involved in placing the sign would not be immunized. Unauthorized persons cannot act legislatively within the meaning of *N.J.S.A.* 59:2–3(b), nor can their actions be considered discretionary, *N.J.S.A.* 59:2–3(a) (discussed *infra* ). *See Birnbaum v. United States,* 588 *F.* 2d 319, 329 (2d Cir.1978) (collecting federal cases); *see also Prosser & Keeton, supra,* at 1041 (actions violating statutes, regulations, or the Constitution are not immunized).

## B.

If *N.J.S.A.* 59:2–3(b) were found inapplicable in this case, then the State could argue that *N.J.S.A.* 59:2–3(a) immunizes its actions. *See Brown, supra,* 86 *N.J.* at 578. That section of the Tort Claims Act provides that "[a] public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity." The basic rule defining the scope of this discretionary function immunity was stated in *Costa, supra,* 83 *N.J.* at 59:

the exemption contemplated under *N.J.S.A.* 59:2–3(a) concerns the 'exercise of judgment or discretion' in making basic policy—the type made at the planning, rather than the operational level of decisionmaking. Moreover, immunity is contingent upon proof that discretion was actually exercised at that level by an official who, faced with alternative approaches, weighed the competing policy considerations and made a conscious choice.

Following *Costa, supra,* 83 *N.J.* at 60, in *Birchwood,* 90 *N.J.* at 601, we reaffirmed that the immunity attaches only when an official charged with making basic policy decisions actually evaluates alternative approaches and consciously exercises discretion. *Accord Johnson v. State,* 69 *Cal.*2d 782, 73 *Cal.Rptr.* 240, 447 *P.*2d 352 (1968) (conscious exercise of discretion means "assuming certain risks in order to gain other policy objectives"); *King v. City of Seattle,* 84 *Wash.*2d 239, 525 *P.*2d 228 (1974) ("policy decision [requires] consciously balancing risks and advantages"); *Bradford v. Davis,* 290 *Or.* 855, 626 *P.*2d 1376 (1981) (policymaking authority must have been properly delega̶ted and responsibly exercised).

The distinction between planning or discretionary acts and operational or ministerial acts reinforces one of our foundational principles of government: the separation of powers. *Prosser & Keeton, supra,* at 1039; *Civil Actions Against State Government* 97 (Winborne, ed. 1982); *see L. Jayson, Handling Federal Tort Claims* 12–5 n. 7, 12–6 n. 8, 12–18 n. 13 & 12–36 n. 7 (Bender pub. 1984) (collecting federal cases). This principle requires the judiciary to give effect to a legislative determination that an authorized decisionmaker may conclude, after reflection, that the potential for certain gains due to a policy

choice outweighs the risks of harm arising from that choice. *Prosser & Keeton, supra,* at 1047. Thus, the immunity in *N.J.S.A.* 59:2–3(a) insulates all basic policy judgments from review, *see Costa, supra,* 83 *N.J.* at 55, because "where there is room for policy judgments, there is room for discretion," *Dalehite v. United States,* 346 *U.S.* 15, 42, 73 *S.Ct.* 956, 971, 97 *L.Ed.* 1427, 1444 (1953). As the Legislature observed in its Comment to *N.J.S.A.* 59:2–3, discretionary decisions are protected from judicial review because they are "reserved to a coordinate branch of government." *See also Prosser & Keeton, supra,* at 1046 (one of "[t]he chief justifications for this immunity * * * [has] been that the judiciary should not invade the province of the executive branch of government by supervising its decisions through tort law * * * ").[8]

This Court has already concluded, however, that the immunity from liability for discretionary functions "protect[s] *only* basic policy judgments." *Costa, supra,* 83 *N.J.* at 55 (emphasis added); *accord Prosser & Keeton, supra,* at 1046–47 (discretionary function immunity applies "only when there is no 'predictable standard' for decisionmaking"). The question, then, is whether the decision to post a particular speed-limit sign entails the kind of policy-making that can properly be characterized as a discretionary governmental action entitled to immunity.

In several cases governments have been held liable on the ground that policy-making or discretion was not involved in the posting or installing of traffic control devices that improperly advised the public, notwithstanding that no liability could attach if the government had chosen to install no device at all. In *Teall, supra,* 34 *Cal.Rptr.* at 871, 386 *P.*2d at 495, Justice Traynor recognized that discretionary immunity did not protect a city that had created a dangerous condition by placing properly functioning traffic signals in a way that misled the public,

---

[8]The other justification commonly asserted is "that if liability were imposed for discretionary decisions, effective executive action would be chilled." *Prosser & Keeton, supra,* at 1046.

even though the city had the right to place traffic signals and even though the city could not have been sued if it had decided not to place signals. In *Harland, supra,* 142 *Cal.Rptr.* at 207, the court similarly recognized "expert testimony that the 65-mile-per-hour posted speed limit was too high in view of the other hazards of the bridge," and held that this contributed to a dangerous condition. See also *Bakity, supra,* 90 *Cal.Rptr.* at 543–45. (recognizing that a 65 mph speed limit could make a stop sign ineffective to avoid a dangerous condition); *Stevenson v. State Department of Transportation,* 290 *Or.* 3, 619 *P.*2d 247 (1980) (court recognized that if drivers were misled by a traffic light, the state agency could be liable to colliding drivers who relied on the lights). The element common to these cases is that the action taken by the state did not involve policy or discretionary decisions, but could be adjudged by straightforward negligence standards. *See also Shuttleworth v. Conti Construction Co.,* 193 *N.J.Super.* 469 (App.Div.1984) (state liable for failure to properly maintain signs); *Brown v. MacPherson's,* 86 *Wash.*2d 293, 545 *P.*2d 13 (1975) (state would be liable if it gratuitously undertook to warn of avalanche danger and failed to do so, if that deprived plaintiff of warnings from others); *Medley v. United States,* 543 *F.Supp.* 1211 (N.D.Cal. 1982) (discretionary function immunity inapplicable if government published an aeronautical chart that failed to indicate dangerous spot on an otherwise safe route through mountainous terrain, because this action affirmatively increased the risk of harm).

Another provision of the Tort Claims Act reinforces the understanding that the discretionary function exception does not immunize a negligent decision involved in the placement of a traffic sign. As previously noted, the Act specifically immunizes public entities and employees "for an injury caused by the *failure* to provide ordinary traffic signals, signs, markings or other similar devices." *N.J.S.A.* 59:4–5 (emphasis added); *see, e.g., Johnson v. Township of Southampton,* 157 *N.J.Super.*

518 (App.Div.), certif. denied, 77 *N.J.* 485 (1978); *Aebi v. Monmouth County Highway Department*, 148 *N.J.Super.* 430 (App.Div.1977). The Legislature's Comment ties *N.J.S.A.* 59:4–5 to this Court's decision in *Hoy v. Capelli*, 48 *N.J.* 81, 86 (1966), where, in denying liability based on the removal of the sole traffic light at an intersection almost two months prior to an auto accident, the Court specifically found that "there is not the slightest suggestion that either driver [involved in an accident had] relied on the fact that * * * any * * * traffic regulation device existed." It thus appears that the Legislature itself differentiated between the immunized decision not to install a traffic sign or other control, and the decision actually to install a particular sign or control at a specific location. The latter decision should not be considered to be so discretionary as to be immune from liability. *Accord Rogers v. State*, 51 *Hawaii* 293, 296–298, 459 *P.*2d 378, 381–82 (1969) (decision where to place a sign is ministerial).[9]

The record also suggests an additional theory that may bar the application of the discretionary immunity of *N.J.S.A.* 59:2–3(a). It has been recognized that "where the government's

---

[9]It also appears that the decision to place the particular sign at Walkers Hollow would present an issue of expert opinion that the jury could consider, as in any other case of professional negligence. Thus, decisions made by government-employed experts may be reviewed if they do not involve considerations of public policy because "[t]he presence of a pre-existing safety standard, or other appropriate standards governing the activity in question, * * * tend[s] to displace the room that otherwise exists for governmental discretion and immunity." *Prosser & Keeton, supra,* at 1041–42; *see, e.g., United States v. Union Trust Co.,* 350 *U.S.* 907, 76 *S.Ct.* 192, 100 *L.Ed.* 796 (1955) (air traffic controllers could be held liable for negligent performance of their duty as experts in guiding airplanes to land); *Griffin v. United States,* 500 *F.*2d 1059 (3d Cir.1974) (decisions involved in the testing of a vaccine are not immunized as discretionary); *Japan Air Lines Co. v. State,* 628 *P.*2d 934 (Alaska 1981) (state's engineers could be liable for negligent action to further the State's policy decision to build a runway suitable for use by wide-body jets); *Supchak v. United States,* 365 *F.*2d 844 (3d Cir.1966) (actionably negligent medical care); *Brown v. United States,* 374 *F.Supp.* 723 (E.D.Ark.1974) (actionably, negligent prisoner care).

activity is affirmative, specific, and in violation of a statute, regulation or constitutional provision imposing a duty upon government, courts are often willing to say that there is no room for discretion." *Prosser & Keeton, supra,* at 1041–42 & nn. 99 & 1 (collecting federal cases); *see also, e.g., Harvey v. Board of Commissioners of Wabash,* 416 *N.E.*2d 1296 (Ind. App.1981) (county must post traffic control signs in precise conformance with applicable state law); *Elson v. P.U.C.,* 51 *Cal.App.*3d 577, 124 *Cal.Rptr.* 305 (1975) (statutory duty to revoke a license eliminates any claim to immunity for failure to act). Consequently, if it were shown that the Bureau Chief's action in posting the 50 mph speed limit sign was in violation of a statute or regulation, then no discretionary immunity can apply.

As discussed at length, *supra* at 506, the plaintiffs' evidence is probative of the proposition that the 50 mph sign at Walkers Hollow set a speed limit that violated applicable statutory standards. That statute, *N.J.S.A.* 39:4–98, requires that the lawful speed limit at Walkers Hollow be less than the 50 mph that has been fixed as the general statewide speed-limit. No regulation could authorize the Bureau Chief to ignore statutory requirements for the placement of speed-limit signs. Thus, the decision to post the speed-limit sign could not be considered a lawful discretionary act. Consequently, the posting of the sign should not be immunized as a discretionary governmental action under *N.J.S.A.* 59:2–3(a).

## IV.

In summary, plaintiffs have presented triable issues of fact with respect to their claims. The proffered evidence is probative of a claim that the accident was proximately caused by a dangerous condition of the highway under the State's control. The evidence also reasonably suggests that relevant immunities under the Tort Claims Act involving legislative or discretionary

action are not, or may not be, available to the State as affirmative defenses.

Accordingly, I believe the judgment below should be affirmed, and the case remanded for trial. I therefore dissent.

O'HERN, J., concurs in the result.

*For reversal*—Justices CLIFFORD, POLLOCK, O'HERN and GARIBALDI—4.

*For Affirmance*—Justice HANDLER—1.