WILLIAM A. HOY, PLAINTIFF-APPELLANT, v. THOMAS CAPELLI AND JEAN B. CAPELLI, DEFENDANTS-APPEL-LANTS, AND CITY OF WILDWOOD, A MUNICIPAL COR-PORATION, DEFENDANT-RESPONDENT.

Argued January 24, 1966—Decided September 7, 1966.

*Mr. Leonard C. Horn* argued the cause for defendants-appellants Thomas Capelli and Jean B. Capelli (*Messrs. Lloyd, Megargee, Steedle, Weinstein & Horn,* attorneys; *Mr. Horn,* of counsel).

*Mr. Marvin D. Perskie* argued the cause for plaintiff-appellant (*Messrs. Perskie & Perskie,* attorneys; *Mr. Perskie,* of counsel).

*Mr. Maurice Y. Cole, Jr.* argued the cause for defendant-respondent City of Wildwood (*Messrs. Cole and Koury,* attorneys; *Mr. Cole,* of counsel).

The opinion of the court was delivered by

HALL, J. Traffic at the intersection of Wildwood and Atlantic Avenues in Wildwood was controlled on January 13, 1964 and for some time previously by a single overhead traffic light. Prior to the installation of the light by the city, regulation had been by two stop signs requiring vehicles proceeding on Wildwood Avenue to come to a halt before

entering the intersection. The signs were removed when the light was installed. On the date mentioned, the city took the light down completely because it was broken and required replacement. The intersection thereafter had no traffic controls. The record is not entirely clear whether this was simply a case of delay in obtaining and erecting a replacement or whether the municipality had decided to do away with the light at this corner permanently. We think it makes no difference as far as the determination of the case is concerned.

On March 2, 1964, plaintiff was driving his car westerly on Wildwood Avenue. According to his deposition, when he reached the Atlantic Avenue intersection, he stopped and looked in both directions. This is the same action he would have been required to take had there been a stop sign at the corner. Seeing no vehicle approaching on Atlantic Avenue, he entered the intersection and a collision resulted with the car of the defendants Capelli, which was proceeding southerly. Each driver said he had not seen the other until almost the moment of impact. There is no indication whatever of any reliance by either operator on the fact that there had once been a traffic light or stop signs at the corner or that either even knew of their past existence. The complete absence of the traffic light therefore had nothing to do with the accident, except in the sense that if traffic had been regulated by a light, it might not have occurred. The same thing would, of course, be true with respect to any unregulated intersection.

The plaintiff sued the Capellis (driver and owner) and the city for his injuries. Thomas Capelli, the driver, cross-claimed against the city for his injuries and the defendants cross-claimed against each other for contribution with respect to any recovery by plaintiff.

The city moved for summary judgment on the ground that, based on the uncontradicted depositions of the drivers and answers to interrogatories, it was engaged in a so-called governmental function in the removal of the light, that its acts did not constitute "active wrongdoing" as a matter of law, and that it was consequently immune from liability. The

trial court granted the motion, finding that there was governmental immunity under the facts. The joint appeal of the plaintiff and the Capellis to the Appellate Division was certified on our own motion before disposition there. *R. R.* 1:10–1(a).

The agreed statement in lieu of record, *R. R.* 1:6–2, poses the contention the appellants assert as follows: "* * * the activity performed by the City of Wildwood in removing the traffic control without replacing same immediately or within a reasonable time thereafter, the period from January 13, 1964 to March 2, 1964, being unreasonable, and without providing or installing a temporary traffic control device, be it traffic light or stop sign or police officer, etc., constituted active wrongdoing either as a matter of law or as a factual dispute to be determined by a jury." They further urge that this court should now advance beyond the present state of our law and declare a municipality responsible for acts of omission or simple negligence even though it was at the time engaged in a governmental activity and the conduct did not amount to active wrongdoing. In the view we take of the case, we do not reach this question.

■ Under the current law of this State, municipal immunity, generally speaking, "is confined to those activities which the municipality undertakes as the agent of the State as distinguished from those which it pursues in its corporate or proprietary capacity." *Cloyes v. Delaware Township*, 23 *N. J.* 324, 327 (1957). That unsatisfactory distinction has, however, been quite undermined here as the cited decision indicates and as a leading scholar in the field has commented. 3 *Davis, Administrative Law Treatise* §25.07, *p.* 466 (1958). Even in the case of a so-called governmental activity, which all parties agree traffic control is, immunity is no longer complete by any means. As this court summarized in *McAndrew v. Mularchuk*, 33 *N. J.* 172, 181 (1960):

"Liability is imposed for injurious acts performed by a municipality in its governmental capacity when they constitute active wrongdoing. That is, when a person suffers an injury through a negligent act of

commission, as distinguished from a negligent failure to act, an obligation to respond in damages is recognized. It is not necessary that the negligent act of commission be the most proximate or nearest in time in a sequence of causes to the injury sustained; it is sufficient if, in the sequence, there is such an affirmative wrongful act even though the cause nearest in the succession of causes may be a mere omission to act. *Hartman v. City of Brigantine*, 23 *N. J.* 530, 533 (1957) ; *Cloyes v. Delaware Tp.*, 23 *N. J.* 324, 329 (1957) ; *Taverna v. City of Hoboken*, 43 *N. J. Super.* 160, 165 (*App. Div.* 1956), certification denied 23 *N. J.* 474 (1957) ; *Kelly v. Curtiss, supra* [29 *N. J. Super.* 291 (*App. Div.* 1954), reversed on other grounds 16 *N. J.* 265 (1954)]."

The thesis was further elaborated in *Hayden v. Curley*, 34 *N. J.* 420 (1961). There the city had properly planted a tree in the public sidewalk, but subsequent root growth raised a portion of the sidewalk causing the plaintiff to fall. The court found active wrongdoing in the subsequent failure adequately to inspect and maintain the site. Liability was spelled out in that situation, but equally applicable in others, even though the original affirmative act was an entirely non-negligent one, by this course of reasoning:

"It is the omission which transmutes the condition created by the prior affirmative act from a lawful obstruction into a nuisance. The affirmative act of creation and the accompanying or subsequent omission form a sequence of events leading up to and causing injury to the traveler. Our courts have held that an affirmative act in the causative sequence resulting in injury is sufficient to sustain municipal liability. The last event in the sequence may be non-action, but the total sequence constitutes active wrongdoing." (34 *N. J.*, at *pp.* 425–26).

The trial judge, in granting the city of Wildwood summary judgment, relied by analogy on *Vickers v. City of Camden*, 122 *N. J. L.* 14 (*E. & A.* 1939). There four traffic lights, one at each corner of the intersection, all went out of order, showing green for both highways at the same time. Both drivers involved relied on the light seemingly in his favor and a collision in the intersection resulted. The court broadly held that the failure to repair properly constructed lights which simply became out of order did not amount to active

wrongdoing and so immunity barred the suit. (The opinion gives no indication whether the city knew of the malfunction or whether it had existed long enough to impose knowledge on it.) While we do not have to decide the question, it seems almost certain that the case would not be decided the same way today in view of the expanded concept of active wrongdoing previously outlined, assuming, of course, that a municipality had notice of the malfunction or a sufficient time had elapsed so that it could be chargeable therewith and that the resulting situation was a realistically causative factor in the occurrence giving rise to the asserted cause of action. In states where former complete immunity for governmental activities has broken down to some degree at least, liability is generally found to exist today for failure to properly maintain and operate a traffic control device where the elements just mentioned are present. *E. g., Johnston v. City of East Moline,* 405 *Ill.* 460, 91 *N. E. 2d* 401 (*Sup Ct.* 1950); *O'Hare v. City of Detroit,* 362 *Mich.* 19, 106 *N. W. 2d* 538 (*Sup. Ct.* 1960); *Firkus v. Rombalski,* 25 *Wis. 2d* 352, 130 *N. W. 2d* 835 (*Sup. Ct.* 1964). But *cf. Arthur v. City of Albany,* 98 *Ga. App.* 746, 106 *S. E. 2d* 347 (*Ct. App.* 1958); *Kirk v. City of Muskogee,* 183 *Okl.* 536, 83 *P. 2d* 594 (*Okl. Sup. Ct.* 1938); *City of Ardmore v. Hendrix,* 348 *P. 2d* 497 (*Okl. Sup. Ct.* 1960).

▉ The instant case is, however, a very different one from *Vickers* and, as the trial judge intimated, a much stronger one for the city. Here the sole traffic light at the intersection had been completely removed for almost two months and there is not the slightest suggestion that either driver relied on the fact that it or any other traffic regulation device had existed. The appellants' position comes down to saying that, because the city once decided that there should be a traffic light at this intersection, a subsequent decision to remove it, either for the purpose of replacement at some later date or to do away with it permanently, may ground liability in the event of an intersection accident thereafter occurring. As their brief puts it, "* * * if the condition causing the injury

was the lack of a traffic control system at the intersection in question, then that condition arose out of municipal action, as distinct from inaction, within the definition of active wrongdoing * * *" As we see it, and appellants practically agreed at oral argument, the situation is legally no different than if there never had been any control device at the corner and a plaintiff offered expert testimony that traffic volume was sufficient to indicate that one should have been installed.

This leads us to the fundamental issue in this case, *i. e.*, whether there are certain kinds of acts or omissions of government, no matter how they are categorized, defined or labelled or how governmental immunity from suit is to be regarded, which should not give rise to tort liability. We are certain that there are and that the situation before us is one of them. We have previously so indicated with respect to the general subject in two cases. In *Amelchenko v. Borough of Freehold*, 42 *N. J.* 541 (1964), the plaintiff was injured when he fell in a municipal parking lot which had not been cleared of a heavy snowfall more than a day after the storm had ceased. The claim was that the borough was negligent in failing to remove the snow and make the lot safe for users prior to plaintiff's fall. The borough showed that, with a limited amount of equipment and manpower available, it had to give priority to clearing arterial streets and then other streets and had been yet unable to reach the parking lot despite working around the clock. This court held that the borough was entitled to judgment as a matter of law. Justice Francis said:

"* * * [W]hen a street department is established, obviously the governing body determines the number of employees to be assigned to it and the amount of snow removal equipment to be purchased and made available for ordinary municipal needs. That determination is a matter of judgment committed under our system of government to the local authority and it should not be interfered with by the courts in a tort damage suit.

Moreover, establishment of a general method of handling snowstorms is a matter of planning. The decision adopting a procedure regulating when, where and in what order of priority the equipment and personnel are to be used in dealing with them is legislative or

governmental in nature. Such decisions cannot be subject to review in tort suits for damages, for this would take the ultimate decision-making authority away from those who are responsible politically for making the decisions. The extent and quality of governmental service to be furnished is a basic governmental policy decision. Public officials must be free to determine these questions without fear of liability either for themselves or for the public entity they represent. It cannot be a tort for government to govern." (42 *N. J.*, at *pp.* 549–550).

The question arose again in *Fitzgerald v. Palmer,* 47 *N. J.* 106 (1966), where plaintiff's decedent was killed when his automobile was struck by a heavy piece of concrete dropped by an unknown person, having a criminal intent, from an overpass constructed by the State Highway Department. The suit was against the State on the thesis that it was negligent in constructing the overpass in that it did not erect wire fences to prevent such an attack. In holding that the complaint did not state a cause of action, and apart from the special problem of the State's immunity from suit, Chief Justice Weintraub spoke as follows on the matter of liability:

"A private entrepreneur may readily be held for negligent omissions within the chosen ambit of his activity. But the area within which government has the power to act for the public good is almost without limit, and the State has no duty to do everything that might be done. Rather there is a political discretion as to what ought to be done, as to priorities, and as to how much should be raised by taxes or borrowed to that end. If government does act, then, when it acts in a manner short of ordinary prudence, liability could be judged as in the case of a private party. So if a road were constructed of a design imperiling the user, the issue of fault would present no novel problem. But whether a road should have four or six or eight lanes, or there should be dividers, or circles or jughandles for turns, or traffic lights, or traffic policemen, or a speed limit of 50 or 60 miles per hour—such matters involve discretion and revenue and are committed to the judgment of the legislative and executive branches. As to such matters, the question is whether a judge or jury could review the policy or political decisions involved without in effect taking over the responsibility and power of those other branches. See *Amelchenko v. Borough of Freehold,* 42 *N. J.* 541, 550 (1964)." (47 *N. J.*, at *pp.* 109–110).

This view is in accord with that of leading scholars and text writers in the field who, despite their unanimous position

that broad governmental tort immunity is a judicially created anachronism unworthy of continued perpetuation, agree that there remains a need for immunity for some "discretionary" functions. 3 *Davis, op. cit. supra* §25.13–25.16, inc.; 2 *Harper and James, The Law of Torts,* § 29.6, *p.* 1625 (1956). Other jurisdictions which have abrogated the immunity doctrine in whole or in part, by statute or judicial decision, have universally held that there should nonetheless be no tort liability for certain types of governmental acts and omissions, generally denominated "discretionary" ones. As examples in states where the broadest kind of immunity waiver has been accomplished by statute, see the outstanding opinions in *Weiss v. Fote,* 7 *N. Y.* 2d 579, 200 *N. Y. S.* 2d 409, 167 *N. E.* 2d 63 (*Ct. App.* 1960), and *Evangelical United Brethren Church of Adna v. State,* 407 *P.* 2d 440 (*Wash. Sup. Ct.* 1965). Where the abrogation was judicial, instances of expression of the same view may be found in *Holytz v. City of Milwaukee,* 17 *Wis.* 2d 26, 115 *N. W.* 2d 618, 625 (*Sup Ct.* 1962); *Spanel v. Mounds View School District No. 621,* 264 *Minn.* 279, 118 *N. W.* 2d 795, 803 (*Sup. Ct.* 1962); and *Muskopf v. Corning Hospital District,* 55 *Cal.* 2d 211, 11 *Cal. Rptr.* 89, 94, 359 *P.* 2d 457 (*Sup. Ct.* 1961). Indeed, the same day the landmark opinion in *Muskopf* abolishing all governmental immunity in California was handed down, that court decided *Lipman v. Brisbane Elementary School District,* 55 *Cal.* 2d 224, 11 *Cal. Rptr.* 97, 359 *P.* 2d 465 (*Sup. Ct.* 1961), holding that a school district did not commit a tort in doing certain acts of a discretionary character.

The language of Judge Fuld in *Weiss v. Fote, supra,* 200 *N. Y. S.* 2d 409, 167 *N. E.* 2d 63, is most appropriate. The case involved a claim that the City of Buffalo allowed too short a clearance interval between the red and green at a traffic light, resulting in a collision in the intersection. In holding the city was not liable, he said:

"To accept a jury's verdict as to the reasonableness and safety of a plan of governmental services and prefer it over the judgment of

the governmental body which originally considered and passed on the matter would be to obstruct normal governmental operations and to place in inexpert hands what the Legislature has seen fit to entrust to experts. Acceptance of this conclusion, far from effecting revival of the ancient shibboleth that 'the king can do no wrong', serves only to give expression to the important and continuing need to preserve the pattern of distribution of governmental functions prescribed by constitution and statute.

\* \* \* \* \* \* \* \*

\* \* \* The immunity which the State enjoyed solely by reason of its status as a sovereign had been severely criticized as unjust and ill adapted to the facts of modern life. The State's explicit waiver of such immunity reflected the felt needs of the times. Nothing in the legislative history of the Court of Claims Act, however, indicates that the waiver provision was designed to override the well-defined and carefully reasoned body of law governing the measure of the State's responsibility for highway safety. The city's defense which we here sustain rests not on any anachronistic concept of sovereignty, but rather on a regard for sound principles of government administration and a respect for the expert judgment of agencies authorized by law to exercise such judgment. In the area of highway safety, at least, it has long been the settled view, and an eminently justifiable one, that courts should not be permitted to review determinations of governmental planning bodies under the guise of allowing them to be challenged in negligence suits; something more than a mere choice between conflicting opinions of experts is required before the State or one of its subdivisions may be charged with a failure to discharge its duty to plan highways for the safety of the traveling public. No such evidence was offered here." (200 *N. Y. S. 2d*, at *p.* 413, 106 *N. E. 2d*, at *pp.* 66, 67).

The problem that arises is not with the concept of certain non-tortious acts or omissions, but how to define and test activities to fall within that category and where to draw the line. Dichotomies of "discretionary-ministerial" or "planning-operational" can be as unsatisfactory as the "governmental-proprietary" distinction has been. See *Elgin v. District of Columbia,* 119 *U. S. App. D. C.* 116, 337 *F. 2d* 152 (*D. C. Cir.* 1964). Some jurisdictions have spelled it out by statute, California recently with great particularity. *Stats.* 1963, *ch.* 1681, *Gov. Code* §§ 810–895.8, including in § 830.6 situations such as involved in the case before us. See *Teall v. City of Cudahy,* 60 *Cal. 2d* 431, 34 *Cal. Rptr.* 869, 386 *P. 2d* 493 (*Sup. Ct.* 1963). The Federal Tort Claims Act pro-

vides for the exception broadly in the terminology of "discretionary." 28 *U. S. C. A.* § 2680. See *Dalehite v. United States,* 346 *U. S.* 15, 73 *S. Ct.* 956, 97 *L. Ed.* 1427 (1953). Professor Davis finds that approach too broad, *op. cit. supra* § 25.08–25.10, inc., and suggests that dealing with the problem by legislation may well be too inflexible and productive of too great a degree of immunity. He advocates that solutions should evolve on a case-to-case basis. § 25.17, 25.18 (1965 *supp.*). There is something to be said, however, for the benefits of advance certainty, with respect to when and how such liability may and may not be found, both to government and prospective claimants.

▪ We are not called upon in this case, however, to draw definitive lines as to what governmental activities or the absence of them should be classified as "discretionary" and have immunity from suit in tort. On the facts here, it is entirely clear that there should be no municipal liability based on the complete removal of this traffic light. The decisions uniformly hold that a governmental determination to install or not to install traffic control devices cannot ground a cause of action. Such was the view not only of the majority but also of the dissenters in *Weiss v. Fote, supra* (200 *N. Y. S. 2d,* at 417, 167 *N. E. 2d,* at *p.* 69). See also *Firkus v. Rombalski, supra* (130 *N. W. 2d* 835, 838); *Johnston v. City of East Moline, supra* (91 *N. E. 2d* 401); *O'Hare v. City of Detroit, supra* (106 *N. W. 2d* 538); *Urow v. District of Columbia,* 114 *U. S. App. D. C.* 350, 316 *F. 2d* 351 (*D. C. Cir.* 1963), *cert.* denied 375 *U. S.* 826, 84 *S. Ct.* 69, 11 *L. Ed. 2d* 59 (1963).

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.