584 A.2d 1359

ROBERT G. WEISS, ADMINISTRATOR AD PROSEQUENDUM OF
THE ESTATE OF ELIZABETH ANN WEISS, AND GUARDIAN
OF THE INFANT, HEATHER WEISS, PLAINTIFF–APPEL-
LANT, v. NEW JERSEY TRANSIT, NEW JERSEY RAIL OPERA-
TIONS, INC. AND NEW JERSEY DEPARTMENT OF TRANS-
PORTATION, THE BOROUGH OF NEW PROVIDENCE, THE
COUNTY OF UNION, A.C. BRANDER, INC., CONRAIL, INC.
AND JOHN DOE 1–25 FICTITIOUS CORPORATE, GOVERN-
MENTAL AND OTHER ENTITIES, DEFENDANTS–RESPON-
DENTS. BOROUGH OF NEW PROVIDENCE, DEFENDANT–
THIRD PARTY PLAINTIFF, v. JERSEY CENTRAL POWER &
LIGHT COMPANY, THIRD PARTY DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued October 30, 1990—Decided January 15, 1991.

266

Before Judges PRESSLER, DEIGHAN and BAIME.

*Henry R. Simon* argued the cause for appellant (*Meryl Shapiro*, of counsel and on the brief and reply brief).

*Thomas J. Kelly, Jr.* argued the cause for respondent Borough of New Providence (*Hurley & Vasios*, attorneys; *Thomas J. Kelly, Jr.*, on the brief).

*John M. Armstrong*, Deputy Attorney General, argued the cause for respondents State of New Jersey, Department of Transportation and Conrail (*Robert J. Del Tufo*, Attorney General, attorney; *Michael R. Clancy*, Assistant Attorney General, of counsel; *John M. Armstrong*, on the brief).

*Edward J. Seaver* argued the cause for respondent New Jersey Transit Rail Operations (*Podvey, Sachs, Meanor & Catenacci*, attorneys; *Edward J. Seaver*, on the brief).

*John G. Butler* argued the cause for respondents A.C. Brandner, Inc., New Jersey Department of Transportation and Borough of New Providence (*Leonard and Butler*, attorneys; *John G. Butler*, on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

Elizabeth Ann Weiss was killed when the automobile she was driving was struck by a New Jersey Transit train at a grade level crossing in the Borough of New Providence. Her father, plaintiff Robert G. Weiss, brought this wrongful death action, as administrator ad prosequendum of his daughter's estate and as guardian of her surviving child, against New Jersey Transit Corporation, New Jersey Rail Operations, Inc., New Jersey Department of Transportation (DOT), New Providence Borough

and Union County.[1]  He appeals from the grant of summary judgment dismissing his complaint against all public-entity defendants.  The court's action was based on its conclusion that beyond any genuine dispute of material fact these defendants were entitled to the design immunity afforded by *N.J.S.A.* 59:4-6 and the immunity afforded by *N.J.S.A.* 59:4-5 for failure to provide ordinary traffic signals.  We disagree and reverse.

The fatal accident occurred on the morning of December 29, 1986.  Decedent, the sole occupant of her car but for a German Shepherd dog which survived the crash, was driving westbound on Central Avenue in New Providence towards its intersection with Livingston Avenue, both municipal streets.  A single railroad track under the jurisdiction of New Jersey Transit runs diagonally through the intersection.  Decedent's car was struck by a northbound New Jersey Transit train as it was making a right turn onto Livingston Avenue.  At the time of the accident, the crossing was not guarded by gates.  Nor were there pavement markings giving advance warning of the crossing approach.  The warning system then in place included mounted crossbucks as well as flashing lights and bells activated by the oncoming train.

In April 1978, after two car-train accidents had already occurred at the Central Avenue crossing, defendant New Providence passed a resolution petitioning DOT to provide for the installation of "appropriate safety devices" at that location. The resolution noted "increased traffic, nearness to public schools and the general nature of the railroad crossing."  A public hearing was conducted before a hearing examiner later that month at which both the borough and Consolidated Rail Corporation (Conrail), the predecessor of New Jersey Transit, were represented.  The hearing examiner's report and recommendation, issued in October 1978, found that at the crossing

---

[1]Plaintiff had voluntarily dismissed against Union County and did not contest the summary judgment motion of defendant A.C. Brandner, Inc.  The respondents on this appeal are the remaining named defendants.

"car to train sight distances are generally poor on all approaches because of trees, utility poles, shrubbery and residential buildings." It also found with respect to the warning system in place that there was "partial restriction to visibility of the flashing signal assemblies because of trees, utility poles and 'Stop' signs." Because of the relatively high volume of traffic at the intersection, consisting of some 4500 vehicles and 30 trains daily, the hearing examiner recommended substantial upgrading of the warning systems. It was his conclusion that:

> In view of the recent accident history and the accident potential generated by the poor sight distances, high number of passenger trains, high speed of trains, presence of school children as pedestrians, flammable cargo carriers, relatively high traffic volumes at the intersection, school buses, motorists' disregard for the flashing signals, the partial visibility restrictions of the flashing light assembly and the diagonal approach of trains, the Examiner is of the opinion that the level of protection should be increased.

Further concluding that compliance with federal mandate for a crossing gate was "impractical," [2] the solution recommended by the examiner was the installation of clearly visible traffic signals at the intersection, connected to railroad circuitry so that all lanes of traffic would have a red signal as a train approached. The examiner further recommended pedestrian "blank-out" signs, "no turn on red" signs, installation of approach pavement markings, and installation of modern reflectorized back-to-back crossbucks. Finally, he recommended that all costs "associated with this project will be paid under the appropriate Federal Aid Program."

Five months later, in March 1979, the DOT Commissioner issued a decision and order adopting the examiner's report and recommendation and directing both the borough and Conrail to take particularly described actions to effect the new signalization plan according to a specifically mandated and expeditious timetable. The Commissioner also directed payment for the

---

[2] We were, however, advised at oral argument that the crossing is now guarded by gates.

project with allocated federal funds made available under the Federal Aid Rail–Highway Safety Program.

Despite the timetable contained in the Commissioner's order, the project was not completed and functional until January 8, 1987, a week after the accident and almost eight years after entry of the Commissioner's order mandating the improvement. In explaining this inordinate, extraordinary delay in completing a funded safety project taking only six weeks of actual construction time, the record demonstrates a tortuous history of bureaucratic red-tape, desultory foot dragging, and lack of intensity which is truly breathtaking. This was after all only a traffic signal, not the Hoover Dam or the Golden Gate Bridge.

The project began apace. In June 1979 and in accordance with the Commissioner's ordered timetable, the borough submitted to DOT preliminary plans for the traffic light installation under cover of letter asking for its review and comments and reiterating its understanding that DOT would arrange for coordination with Conrail for its part of the work. In December 1979 the borough sent additional plans to DOT. In April 1980 the borough passed and transmitted to DOT a resolution acknowledging that it had been ordered by DOT to install the signal, acknowledging its eligibility for federal funding, and undertaking to make the installation and to maintain it. The following month DOT wrote to the borough asking for additional specifications. Fourteen months passed. On July 20, 1981, DOT sent a rather cryptic letter to the borough advising that "a cursory check has found that the plans submitted with your memorandum [of July 7, 1981] are the same as prepared by Department [DOT] forces."

In the meantime the borough and Conrail were in communication in the spring of 1981. In March of that year the borough asked Conrail to respond to the plans it had sent it the previous November. On two occasions in April 1981 the borough sent Conrail additional plans and specifications. In June 1981 the borough was favored with a reply from Conrail advising it that

it had no objections to the borough's plans, that its, Conrail's, signal estimate submitted to DOT a year earlier was still valid and that it was "still awaiting their [DOT] authority to proceed with alterations to the traffic control devices." In June 1981 the borough sent DOT Conrail's "approval" together with a few more sets of plans and specifications and requested DOT's advice on what "remaining steps must be taken to institute construction of the signal."

Insofar as the record shows, 1982 was a quiet year. In March, some nine months after its last letter to DOT, the borough again wrote to ask it what pre-construction steps remained to be completed. In June the borough sent DOT more sets of plans and specifications, copies of cost estimates and copies of the borough's maintenance agreement. The year 1983, however, saw a bit more progress. In March, the borough sent DOT more plans. In June New Jersey Transit, which by then had succeeded to Conrail's interest, entered into an agreement with DOT which, in effect, added this project to those funded under the federal Highway Safety Act and included DOT's authorization to New Jersey Transit to proceed with the work as ordered by the Commissioner more than four years earlier. In October, the borough again asked DOT what remained to be done. That letter evoked a DOT response on October 19 advising the borough that its plans and specifications had been reviewed and approved, that New Jersey Transit had been noticed to proceed with construction, that it, DOT, would schedule a pre-construction meeting with all interested parties, and that "the starting date for this project should be this fall or early spring." No such start occurred.

The next record notation of activity is September 1984, five and a half years after the Commissioner's order. In that month, the borough advised DOT that it had authorized advertisement for bids, that it expected completion within the week of New Jersey Transit's review of its portion of the plans, and that it was awaiting DOT's authority to go to bid. Apparently that authority was eventually received since in December 1984

the borough reported to DOT on the two bids it had received. Unfortunately, that bidding process proved to be another exercise in futility. In January 1985 DOT advised the borough that its Electrical Bureau had "re-reviewed" the plans and wanted changes that "could affect the status of our bid." The required revisions took several more months to accomplish. In June 1985, after the new plans and specification had been approved, DOT advised the borough that in order to comply with federal funding requirements, the State, not the borough, would have to advertise for bids. DOT then assured the borough that it would proceed to do so and that another pre-construction meeting would be held after the bid award was made.

It took only another year for the bids to be received and reviewed and the contract to be awarded. Finally, on July 7, 1986, DOT entered into its construction agreement with A.C. Brandner Electrical Contractor, who had also been the low bidder eighteen months previously in the borough's abortive bidding procedure. We also note that during an approximately six-month period prior to the award of bids, the borough had written not only to DOT but to other state officials, including senators and assemblymen, complaining of the delay in construction, referring to the crossing as increasingly hazardous, reporting on numerous citizen complaints about the unalleviated danger and seeking assistance in having the project commenced.

In any event, construction of the project commenced timely after completion of the contract documents. Regrettably, however, after the project was apparently finished in November 1986, DOT, having decided that an eight-way signal rather than the specified four-way signal should be installed, issued a change order. The contractor completed that work on December 15, 1986. Unfortunately, it was not inspected by DOT and placed in use until early January, 1987. This fatal accident occurred in those intervening three weeks.

■ We address the immunity questions raised by this appeal in the light of the foregoing factual background. To begin with, we are satisfied that the design immunity relied on by the trial judge is entirely inapposite. *N.J.S.A.* 59:4–6 provides that:

> Neither the public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of public property, either in its original construction or any improvement thereto, where such plan or design has been approved in advance of the construction or improvement by the Legislature or the governing body of a public entity or some other body or a public employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved.

Apparently both the parties and the court mistakenly considered this statutory immunity in the context of the plan and design for the new signalization system. The point, however, is that the accident was alleged to have been caused by the original and inadequate warning system. There was, moreover, never any attempt by any defendant to demonstrate that that system had ever been the subject of a plan or design approved by a governmental agency, and we will not assume that it was. *See, e.g., Kolitch v. Lindedahl,* 100 *N.J.* 485, 497, 497 *A.*2d 183 (1985); *Birchwood Lakes Colony Club v. Medford Lakes,* 90 *N.J.* 582, 599–600, 449 *A.*2d 472 (1982). Thus plan and design immunity is plainly inapplicable here.

■■ The question of the immunity for failure to provide ordinary traffic signals is more difficult. We are nevertheless of the view that it too does not apply to the factual complex before us. *N.J.S.A.* 59:4–5 provides that:

> Neither a public entity nor a public employee is liable under this chapter for an injury caused by the failure to provide ordinary traffic signals, signs, markings or other similar devices.

This immunity must be juxtaposed against *N.J.S.A.* 59:4–4, which provides for public-entity liability for injury

> ... caused by its failure to provide emergency signals, signs, markings or other devices if such devices were necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by a person exercising due care.

In resolving the issue before us, there are two pertinent inquiries. First, to the extent that the accident was attributa-

ble to the inadequacy of the warnings then in place, was that inadequacy a failure to provide emergency signals within the intendment of 59:4-4 or a failure to provide ordinary signals within the intendment of 59:4-5? Second, is the negligence here complained of, namely a palpably unreasonable delay by the public entities in complying with a railroad safety order duly issued by the Commissioner, appropriately characterizable at all as the failure to provide ordinary traffic signals within the statutory intendment even if 59:4-5 and not 59:4-4 were to control?

We consider the second of these questions first. According to the Legislative Comment appended to *N.J.S.A.* 59:4-5, the ordinary traffic signal immunity therein adopted was deemed to be consistent with then existing New Jersey law. Cited by the Comment in support of that proposition is *Hoy v. Capelli,* 48 *N.J.* 81, 91, 222 *A.*2d 649 (1966), which held, in accordance with the great weight of authority around the country, that "a governmental determination to install or not to install traffic control devices cannot ground a cause of action."

Our courts have continued to emphasize that the subject of the immunity intended by 59:4-5 is the public entity's exercise of planning-level discretion respecting traffic control devices. Thus in *Aebi v. Monmouth County Highway Dept.,* 148 *N.J. Super.* 430, 433, 372 *A.*2d 1130 (App.Div.1977), this court explained that "the determination as to the advisability or necessity of a traffic sign or warning device at any particular place requires the exercise of discretion, and hence *N.J.S.A.* 59:4-5 simply specifies one particular type of discretionary activity to which immunity attaches." In quoting *Aebi* with approval in *Kolitch, supra,* 100 *N.J.* at 495-496, 497 *A.*2d 183, the Supreme Court reiterated the discretionary nature of the governmental activity intended to be protected by 59:4-5. And in *Shuttleworth v. Conti Constr. Co., Inc.,* 193 *N.J.Super.* 469, 472, 475 *A.*2d 48 (App.Div.1984), we addressed the scope of that immunity in similar terms, noting again that the purpose of the statutory exemption was to make clear that "the courts should

not second guess a ... legislative decision to control or not to control an intersection." Consequently, as we held in *Shuttleworth*, there is a substantial conceptual difference between the taking of the discretionary decision itself and, on the other hand, "the creation or maintenance of a dangerous condition after the discretionary decision has been taken ..." *Id.* at 473, 475 *A.*2d 48. The first is immune from tort liability. The second may not be if the dangerous condition otherwise meets the requirements of *N.J.S.A.* 59:4-2 for imposing liability on a public entity based on the dangerous condition of its property.

Obviously, we are dealing here with the maintenance of a known dangerous condition long after the discretionary decision was made to upgrade the warning system for a hazardous railroad crossing. More significantly, the discretionary decision was made on a high governmental level by the Commissioner of DOT. There was absolutely nothing discretionary in the obligation of the borough, the railroad, and DOT staff to comply with the Commissioner's remedial order of March 1979. Insofar as these public agencies and entities are concerned, the provision of the upgraded warning system from that time forward was not optional. It was mandatory. Hence we see nothing in the policy and purpose of 59:4-5 which suggests its applicability in the circumstances here.

The gravamen of plaintiff's complaint, as we have pointed out, is the alleged unreasonable delay, on operational and ministerial levels, in complying with and implementing the mandates of the Commissioner's order, issued for the purpose of protecting the public from a known danger. While the precise issue of public-entity liability for unreasonable delay in this context has not been addressed in this jurisdiction, it has been considered by the New York Court of Appeals in *Friedman v. State*, 67 *N.Y.*2d 271, 286, 493 *N.E.*2d 893, 900, 502 *N.Y.S.*2d 669, 676 (1986). In *Friedman*, the Court concluded that "when a municipality studies a dangerous condition and determines as part of a reasonable plan of governmental services that certain steps need not be taken, that decision may not

form the basis of liability." The Court nevertheless went on to hold that when "analysis of a hazardous condition by the municipality results in the formulation of a remedial plan, an unjustifiable delay in implementing the plan constitutes a breach of the municipality's duty to the public...." *Id.*

We agree and accordingly hold that a palpably unreasonable delay in implementing a mandated traffic control system for a hazardous location is not conduct rendered immune by 59:4–5. Moreover, we are satisfied, based on the motion record, that a jury could here conclude that the delay was both unjustifiable and attributable to the negligence of one or more of the public entity defendants.

■ Having held that plaintiff's action is not barred by *N.J.S.A.* 59:4–5, we address the question of whether defendants may be liable under *N.J.S.A.* 59:4–4 as well as 59:4–2. Whether a public entity is liable under 59:4–4 or immune under 59:4–5 may depend on the controlling circumstances. There are circumstances here which could justify the finder of fact in concluding that the prescriptions of 59:4–4 might apply. According to the Legislative Comment, liability thereunder is predicated on the existence of a condition "constituting a 'trap' to a person using a street or highway with due care." Clearly, as we held in *McGowan v. Borough of Eatontown*, 151 *N.J.Super.* 440, 450, 376 *A.*2d 1327 (App.Div.1977), a chronic or repetitive traffic danger may qualify as a "trap" despite the "emergency" phraseology of the statute.[3] The question is not one of potential for or frequency of recurrence of the risk but only whether a person using due care would be able to appreciate, anticipate and avoid the danger without special warning.

---

[3]Although *McGowan* did not expressly overrule *Spin Co. v. Maryland Cas. Co.*, 136 *N.J.Super.* 520, 524, 347 *A.*2d 20 (Law Div.1975), which defined "emergency" as used by *N.J.S.A.* 59:4–4 as a sudden or unexpected occurrence, the import of *McGowan* is contrary to *Spin's* narrow reading.

A rail crossing is different from a vehicular intersection. In the latter case there are rules of the road on which every driver may rely and which every driver is expected to obey in negotiating an uncontrolled intersection. *See N.J.S.A.* 39:4–90. The consequent ability of careful drivers safely to traverse uncontrolled intersections is what makes intersection controls "ordinary" and discretionary under *N.J.S.A.* 59:4–5 rather than "emergent" under *N.J.S.A.* 59:4–4.[4] But the same is not true of an automobile roadway crossing a railroad track. A driver must be aware of whether a train is coming before venturing onto the tracks. The train always has the right of way, requires relatively longer stopping times, and is not able to take defensive action. Moreover, the automobile driver ordinarily requires some mechanical assistance to know that the train is approaching. Thus the factual issue is whether the warning system in place, if any, is adequate to alert a reasonably careful driver of the danger of an approaching train. The factual findings of the hearing examiner here in 1979, the reports of plaintiff's experts, and the importuning correspondence of the borough in 1986 to which we have referred suggest that the warning system which was in place when this accident occurred was so inadequate in the circumstances as to have failed, within the statutory intendment, reasonably "to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care." In any event a factual question respecting the applicability of *N.J.S.A.* 59:4–4 was presented which precluded summary judgment.

The summary judgment entered in favor of the public entity defendants based on *N.J.S.A.* 59:4–5 and 59:4–6 is reversed, and

---

[4]And that is also what makes non-actionable, as in the case of an ordinary control, a municipal failure to repair a non-operating traffic light, as opposed to a municipal failure, which is actionable as in the case of emergency warnings, to protect the public from a malfunctioning signal which misdirects drivers. *Compare Hoy v. Capelli,* 48 *N.J.* 81, 222 A.2d 649 (1966), *supra,* with *Bergen v. Koppenal,* 52 *N.J.* 478, 246 A.2d 442 (1968).

the matter is remanded to the trial court for further proceedings.