**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2596-16T4

MILAGRO ARITA-MEJIA,

    Plaintiff-Appellant,

v.

KEVIN H. THOMAS and CITY
OF UNION CITY,

    Defendants,

and

STATE OF NEW JERSEY and
STATE OF NEW JERSEY
DEPARTMENT OF
TRANSPORTATION,

    Defendants-Respondents.

_____

Argued September 16, 2019 – Decided October 3, 2019

Before Judges Sabatino, Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-1992-15.

John S. Hoyt, III, argued the cause for appellant (Hoyt & Hoyt, PC, attorneys; John S. Hoyt, III, on the briefs).

John Francis Regina, Deputy Attorney General, argued the cause for respondents (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; John Francis Regina, on the brief).

PER CURIAM

This case arises out of a one-vehicle motorcycle accident that occurred in Union City on a dark, partially enclosed ramp that descends to a circle on Interstate 495. The motorcycle struck a curb when its operator was apparently attempting to brake for a stop sign located on the left side of the roadway. Plaintiff, a passenger, was thrown off the motorcycle, causing her to sustain traumatic brain damage and other severe injuries. The operator, who also was ejected from the motorcycle, was briefly hospitalized and has since disappeared.

Plaintiff brought claims under the Tort Claims Act, 59:1-1 to 12-3 ("TCA" or "the Act") against the State of New Jersey and the New Jersey Department of Transportation ("DOT"),[1] alleging the roadway was in a dangerous condition that was a proximate cause of the crash. Among other things, plaintiff and her engineering expert stressed the stop sign was placed on the wrong side of the

---

[1] Unless otherwise indicated for context, we will refer to the State defendants collectively as "the State."

2                                                          A-2596-16T4

roadway, all but one of the ramp's six street lamps had burned out, two local police officers testified in depositions that the ramp was dark and dangerous, and many previous accidents have occurred at the location.

The trial court granted the State's motion for summary judgment. In particular, the court found that plaintiff had not presented genuine material issues of fact to establish a dangerous condition, notice of that condition, proximate causation of the accident, and "palpably unreasonable" conduct on the part of the State. Plaintiff now appeals the court's dismissal of her claims.

For the reasons that follow, we vacate the court's summary judgment ruling and remand for further proceedings. Considering the record in a light most favorable to plaintiff, there is an ample basis for reasonable jurors to conclude: (1) the roadway was a dangerous condition; (2) the State had constructive notice of the condition; (3) the condition was a proximate cause of the accident; and (4) the State's failure to maintain the street lamps, along with its alleged misplacement of the stop sign on the left side of the roadway, was palpably unreasonable.

In addition, we reject the defense argument – one which the motion judge did not adopt – that the record suffices to establish the State is shielded from liability under the "ordinary sign" immunity set forth in N.J.S.A. 59:4-5.

3

Lastly, we vacate the trial court's determination that the reports of plaintiff's liability expert were inadmissible net opinion.

I.

We discuss the pertinent facts and the parties' factual contentions in a light most favorable to plaintiff. W.J.A. v. D.A., 210 N.J. 229, 237 (2012). As we will note within this opinion, certain facts are hotly disputed or are presently unclear from the existing record.

The Accident

On the evening of May 12, 2013, plaintiff Milagro Arita-Mejia was riding as a passenger on the motorcycle of her then-boyfriend, co-defendant Kevin Thomas. The couple was returning to plaintiff's home in Hawthorne, New Jersey, around 10:00 p.m., after visiting with her mother in Union City, New Jersey. According to plaintiff, Thomas was unfamiliar with the area.

The motorcycle was traveling northbound on Kennedy Boulevard in Union City towards a traffic circle by the entrance ramp for I-495 and Route 3, when it started going down what plaintiff described as a "shoot."[2] The one-way, single-lane chute had a wall on the right side and a concrete barrier with several

_____

[2] This term is a typographical error in the deposition transcript. It is clear from the context that plaintiff said (or was intending to say) the word "chute."

4

pillars on the left. In her deposition testimony, plaintiff described the stretch of road as "like a cave, pitch dark," and that "you couldn't see nothing in front." She does not remember falling from the motorcycle, or anything else after entering the chute, until the point later in time when she awakened in a hospital bed.

Several Union City police officers investigated the accident, although none of them had observed it happen. According to Officer John Puente's report, the motorcycle had crashed into the left side of the curb before reaching the stop sign at the bottom of the ramp. The roadway curves down to the right, with a concrete median barrier to the left and a concrete wall to the right. The stop sign was positioned on the left side of the down ramp, just before the I-495 circle.

Officer Puente acknowledged in his deposition that the roadway went from a "very light" area to a "pitch-black" area. He indicated in his report that "all of the lights on the I-495 circle were out except for one." Puente had not personally notified the DOT about the poor lighting, and was not aware if the DOT had been notified by anyone else.

A-2596-16T4

The first patrolman who arrived at the scene, Officer Paul Molinari, echoed Officer Puente's observations about the roadway's poorly-lit condition. Officer Molinari described the condition at his deposition as follows:

> Q. [Plaintiff's Counsel] Did you have any feeling as to the safety or not of the lighting conditions?
>
> A. [Molinari] Yes.
>
> Q. What were your feelings?
>
> A. I felt as though that the lighting conditions were not appropriate for that specific area because it's, <u>it's very, very dark down there</u>.
>
> Q. When you say "not appropriate," unsafe?
>
> A. <u>Unsafe, yes</u>.
>
> [(Emphasis added).]

When Officer Molinari arrived at the scene, he saw the motorcycle on its side, with plaintiff and Thomas on the ground. He also saw people he described as "multiple [S]amaritans" on the side of the road, none of whom apparently had seen the accident occur. Neither party has identified any eyewitnesses who saw the accident.

Thomas was not interviewed at the scene. When Officer Puente visited the hospital the next day to try to speak with him, Thomas was heavily medicated

A-2596-16T4

in intensive care, and unable to talk. Puente did not speak with Thomas after that.

In plaintiff's deposition, she described the weather on the night of the accident as "clear, warm, no rain, nothing." Although she could not see the speedometer from the back of the motorcycle, she testified that Thomas was driving at a "normal speed" of approximately twenty-five miles per hour, consistent with the posted speed limit.[3] Plaintiff apparently was not wearing a certified motorcycle helmet at the time of the accident, as her helmet lacked the customary United States Department of Transportation ("USDOT") "stamp" of approval.[4]

Plaintiff stated that Thomas had not been drinking that day. There is no indication in the record that Thomas was intoxicated when the accident took place, or that he had been given a breathalyzer afterward.

---

[3] Although in his oral ruling on summary judgment the motion judge stated that Thomas "acknowledged" he was using his headlights, we find no support of that particular fact in the record.

[4] See N.J.S.A. 39:3-76.7 which provides in pertinent part: "A person shall not operate or ride upon a motorcycle unless the person is wearing a securely fitted protective helmet of a size proper for that person and of a type approved by the chief administrator [of the USDOT]."

According to her medical proofs, as a result of the accident plaintiff suffered a traumatic brain injury, a swollen eye, a broken toe, and broken ribs. A rod had to be placed in her left arm and left leg.[5] Plaintiff stated that she now has trouble remembering things, such as activities with her daughter. Even so, at her deposition plaintiff did not express any difficulty remembering the events leading up to the accident.

According to plaintiff, Thomas stayed with her in her home for a "couple of weeks" after the accident. However, after he departed, plaintiff only saw him once more, when he returned to pick up his belongings. Thomas was apparently issued a traffic summons for careless driving.[6] During the time he was staying with plaintiff, Thomas admitted to her that he never attended his municipal court hearing on the summons.

Thomas has since disappeared, and no one has been able to locate or contact him.

---

[5] The State apparently does not contend plaintiff's injuries fail to surmount the TCA's verbal threshold, N.J.S.A. 59:9-2(d).

[6] The summons is not in the appellate record.

Plaintiff's Lawsuit and Her Claims of an Actionable Dangerous Condition

Plaintiff filed a personal injury complaint in the Law Division in May 2015 against Thomas, the State, the DOT, and the City of Union City. The City was dismissed from this case. Thomas has not participated in the litigation. Plaintiff contends the State is liable to her under the "dangerous condition" provision within the TCA, N.J.S.A. 59:4-2.

To support her claim the roadway was in a dangerous condition, plaintiff obtained from Union City copies of police reports documenting 126 previous accidents at that location. Plaintiff initially supplied defense counsel and the motion judge with seventeen of those police reports, and then apparently supplied the remainder around the time the discovery period was extended.

Although some portions of the photocopied accident reports are hard to read, several of them support plaintiff's contention that the stop sign at the bottom of the ramp was moved at some point in time from the right side to the left side of the roadway. The State has offered no explanation for why and when the stop sign was relocated. It has produced no records concerning any decisions that were made about the sign's placement.

The Competing Liability Experts

Both sides retained professional engineers as liability experts. Those engineers collectively issued five expert reports: three from plaintiff's expert and two from the State's expert.

Plaintiff's liability expert is Fred R. Hanscom, P.E., who is a traffic safety engineer with over thirty-five years of experience in highway safety and research. He has published over fifty research articles in the field.

Hanscom opined, within a reasonable degree of engineering certainty, that a combination of several factors made this roadway location dangerous and nonconforming to applicable standards of care. In particular, Hanscom criticized the dim lighting within the ramp, the placement of the stop sign on the left side of the roadway instead of the right side, and the absence of "retro-reflective" curbing or other traffic devices to alert motorists to the curvature of the ramp as it connects with the I-495 circle. As Hanscom wrote in his first expert report:

> [T]he long straight ramp downgrade was well illuminated; however, luminaires on [the] circle underpass approach to the I-495 circle were not functional due to lack of maintenance. As a result of the darkened environment at the ramp terminus, there was no visual cue to advise drivers of the ramp curvature on the circle.

A-2596-16T4

The retro-reflective Stop sign position in combination with the ramp approach geometry gave the visual impression to approaching motorists that the ramp continued straight ahead. Due to the fact that Stop signs are customarily placed on the right side of an intersection approach, the resulting visual effect in this case created the driver expectancy that the roadway ahead continued to the left of the Stop sign. Furthermore, [t]here was no retro[-]reflective curbing or other traffic control devices to indicate the curvature of the ramp upon entering the circle underpass.

Hanscom cited to standards specified in the Manual on Uniform Traffic Control Devices ("MUTCD" or "the Manual"), a manual drafted by the National Committee of Uniform Traffic Control Devices.[7] According to his expert report, Hanscom served as the "human factors" representative of the National Committee for over ten years.

The MUTCD, a Manual approved by the Federal Highway Administrator, is a national standard for all traffic control devices installed on any street, highway, or bicycle trail open to public travel. 23 C.F.R. 655.603(a). The

---

[7] See U.S. Dep't of Transp. Fed. Highway Admin., Manual on Uniform Traffic Control Devices for Streets and Highways (2009), https://mutcd.fhwa.dot.gov/. We shall discuss the significance of the MUTCD in more detail, infra.

A-2596-16T4

MUTCD is also adopted by reference in accordance with a federal statute, 23 U.S.C. § 109(d).[8]

Hanscom asserts the State's placement of the stop sign on the left side of this ramp, rather than the right side, is contrary to Section 2B.10 of the MUTCD. That provision prescribes: "The STOP or YIELD sign shall be installed on the near side of the intersection on the right-hand side of the approach to which it applies." (Emphasis added).

However, the State's liability expert, Steven M. Schorr, P.E., points out that Section 2A.16 of the Manual provides: "Under some circumstances, such as on curves to the right, signs may be placed on median islands or on the left-hand side of the road." (Emphasis added).

---

[8] The most recent changes to the MUTCD were effective on January 15, 2010. A federal regulation, 23 C.F.R. 655.603(b)(3), gives states a two-year period from the effective date to adopt the MUTCD. Therefore, by January 15, 2012, states were required to have either adopted the national manual or have a state MUTCD supplement that is in substantial conformance with the national Manual. 23 C.F.R. 655.603(b)(1). It is undisputed that New Jersey has not adopted a state MUTCD supplement. On that score, N.J.S.A. 39:4-120 empowers the State's motor vehicle agency to adopt uniform traffic control signals in a system that "shall correlate with and so far as possible conform to the [then-current MUTCD"]. Hence, the standards in the MUTCD indisputably apply in this State. In fact, as we note, infra, the State's liability expert himself cites the MUTCD in his analysis of this case.

In response, Hanscom's third expert report cites Section 1A.09 of the Manual, which requires the decision to use a particular device at a particular location to "be made on the basis of either an engineering study or the application of engineering judgment." Hanscom asserts that the DOT failed to exercise such judgment here when it "took the liberty" of placing the sign on the left side of the road.

Schorr, the State's liability expert,[9] conducted a site inspection of the roadway, which included high-definition laser scans. Schorr also noted a tire mark shown on police photographs. He also reviewed the deposition testimony of plaintiff and the two police officers.

According to Schorr, if Thomas had been traveling at or about the twenty-five mph speed limit, "the physical evidence, including the location of the tire mark, establishes that he could have safely stopped the motorcycle prior to reaching the stop sign." Schorr reached this conclusion by applying a "nighttime perception-plus-reaction-time" ("PRT") formula, utilizing an assumption that a nighttime driver should be able to perceive and react to a situation within 2.0

---

[9] The credentials of Schorr have not been supplied in the appellate record, but plaintiff's brief has not challenged his expert qualifications. The opinions in Schorr's expert reports, like those of Hanscom, are presented "within a reasonable degree of engineering certainty."

seconds. Schorr calculated in his first report that a motorist traveling at a speed of twenty-five mph would have noticed the stop sign approximately 130 feet ahead,[10] and would have been "able to perceive, react, and brake [his] vehicle to a complete stop in less than 110 feet."

Schorr further opined there is "no data to indicate that the lighting or lack of lighting in the area played any role in the collision." He concluded that the collision instead "occurred as the result of the improper actions" of Thomas, the operator, who failed to brake in time for the stop sign and lost control of the motorcycle.

Hanscom disputed Schorr's opinions. Among other things, he asserted that Schorr's use of a 2.0 second PRT was "unrealistic given the difficult-to-perceive nature of the hazard in this case." Hanscom stated that a PRT of 2.5 or 3.0 seconds is more appropriate for this particular location. Hanscom also emphasized that the placement of the stop sign on the left side critically affected the operator's perception-reaction time, because drivers generally expect stop signs to be "placed to their right as they approach an intersection."

---

[10] In his second report, Schorr states that the visibility distance was "at least" 175 feet.

14

Responding to Hanscom in his second expert report, Schorr countered that the tire mark left by the motorcycle indicates an attempt by Thomas to brake at least fifty-five feet before the stop sign. According to Schorr, this "physical evidence establishes that the motorcycle operator perceived that he needed to apply his brakes in sufficient time and distance to stop prior to reaching the stop sign." Schorr disagreed with Hanscom that any retro-reflective markings on the curb were either warranted or required.

The Motion Practice

The motion practice in this case was complicated by the simultaneous pendency of a motion by the State for summary judgment and a motion by plaintiff to extend discovery. The application for a discovery extension was heard by the vicinage's Presiding Judge of the Civil Division ("the presiding judge"), whereas the summary judgment motion was heard by a different judge in the Civil Division ("the motion judge").

Plaintiff particularly sought the discovery extension to include the second and third reports of her liability expert Hanscom, which included his findings from a videotaped site visit that he performed after his initial report.[11]

---

[11] It appears that Hanscom conducted a site visit after the defense criticized him in its motion papers for not performing a site visit.

On December 16, 2016, the presiding judge granted the discovery extension motion, noting in the order that her decision was largely based on the contents of plaintiff's submission "regarding [her] due diligence efforts." The order established new discovery deadlines, allowing plaintiff to submit her liability expert's report(s) by December 30, 2016, and for any response from the defense expert by January 26, 2017. The presiding judge disallowed plaintiff's request for extra time to conduct expert depositions. The overall discovery end date was thus extended to January 26, 2017. Notably, all three of Hanscom's reports and both of Schorr's reports were submitted within these deadlines; in fact, they were exchanged before the date of the December 16, 2016 extension order itself.

Meanwhile, the State's motion for summary judgment was returnable before the motion judge on the very same day, December 16, as plaintiff's discovery extension motion. Although we cannot tell with certainty exactly what materials counsel provided to the motion judge, apparently the judge did have the parties' five expert reports, deposition testimony of plaintiff and the

two police officers, and at least seventeen of the Union City police reports documenting other accidents that had occurred at the location.[12]

The summary judgment motion was considered on the papers, without oral argument. The judge granted the motion and issued an oral opinion on December 16, 2016.

The Summary Judgment Ruling

In his oral ruling, the motion judge concluded plaintiff had not presented a viable cause of action against the State for dangerous condition liability under the TCA. As a preliminary matter, the judge noted that plaintiff's opposition to the motion had been late, and included police reports about prior accidents and supplemental expert reports from Hanscom that the judge thought had not been produced in discovery. Further, the judge discounted Hanscom's expert conclusions as inadmissible net opinion, because Hanscom's initial report had not been based on a site visit.

Turning to the merits, the motion judge concluded plaintiff had failed to present sufficient evidence to establish a dangerous condition under N.J.S.A. 59:4-2. In particular, the judge determined that there was no proof that "the

---

[12] It is unclear whether the motion judge at that time had the remainder of the 126 police reports.

 A-2596-16T4

darkness [in the ramp] allegedly as a result of poor lighting, was dangerous." The judge also stated – apparently mistakenly – that Thomas had "acknowledged that he was using his headlights." The judge adopted the State's theory that "a stop sign was illuminated for at least 175 feet before the intersection." The judge did not comment, however, on the testimony of the two police officers who had corroborated plaintiff's own recollection that the ramp was dark and dangerous.

Further, the motion judge found that plaintiff had not presented a viable jury question on proximate causation. He stated in this regard that plaintiff had a "complete lack of recollection about the accident." Accordingly, the judge found the facts presented by plaintiff about how the accident occurred were "only supported by her speculation." The judge found there were "no witnesses who were able to testify as to a cause of the accident." Hence, he concluded "the dearth of any evidence as to causation is fatal to plaintiff's cause of action" against the State.

Additionally, the motion judge concluded there was no evidence that the State had either actual or constructive notice of the condition of the roadway being dangerous. He found there was no evidence of complaints or injuries being brought to the State's attention before the accident.

Lastly, the motion judge ruled that plaintiff could not meet her burden of proving under N.J.S.A. 59:4-2 that the State's actions and inactions were "palpably unreasonable." In this regard, the judge found no evidence the State knew "anything about the lack of illumination" on the ramp.

Reconsideration Denied

Plaintiff moved for reconsideration, apparently calling to the motion judge's attention the discovery extension that had been granted by the presiding judge concurrently on December 16. Plaintiff also apparently furnished the motion judge with additional materials that had been turned over to the defense before the now-extended discovery end date.

The motion judge denied reconsideration, without argument. In the body of his February 17, 2017 order denying reconsideration, the judge stated that plaintiff "does not demonstrate how the information that might be obtained during the discovery extension permitted by [the presiding judge] will impact the [c]ourt's [summary judgment] decisions."

The Appeal

Plaintiff appealed the motion judge's orders granting summary judgment and denying reconsideration. The State has not cross-appealed the presiding judge's order granting the discovery extension.

II.

A.

The applicable standards for dangerous condition liability under the TCA are well established. In order to recover for an injury under the general liability section of the TCA, N.J.S.A. 59:4-2, a plaintiff must prove several elements. As the statute prescribes:

> A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
>
> a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
>
> b. a public entity had actual or constructive notice of the dangerous condition under [N.J.S.A.] 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
>
> Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.
>
> [N.J.S.A. 59:4-2.]

The Act defines a dangerous condition as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used. N.J.S.A. 59:4-1. Courts have defined a "substantial risk" as "one that is not minor, trivial or insignificant." Kolitch v. Lindedahl, 100 N.J. 485, 493 (1985) (quoting Polyard v. Terry, 160 N.J. Super. 497, 509 (App. Div. 1978)). We observed in Polyard that "[e]ach case where the issue arises must be pragmatically examined by the judge, to determine whether the particular highway irregularities were such that reasonable minds could differ as to whether they manifested that the highway was in a dangerous condition." Polyard, 160 N.J. Super. at 510.

A tort claimant in New Jersey also must prove under Section 4-2 that the public entity had actual or constructive notice of the dangerous condition. A plaintiff must demonstrate in this respect:

> a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
>
> [the] public entity had actual or constructive notice of the dangerous condition under [N.J.S.A.] 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
>
> [N.J.S.A. 59:4-2.]

Actual notice exists where the public entity had "actual knowledge of the existence of the condition and knew or should have known of its dangerous character." N.J.S.A. 59:4-3(a). By comparison, constructive notice is satisfied if the plaintiff shows "the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition and its dangerous character." N.J.S.A. 59:4-3(b). See, e.g., Chatman v. Hall, 128 N.J. 394, 418 (1992) (noting the length of time a pothole existed, along with its alleged size, could support a reasonable inference that the defendant had either actual or constructive notice).

Another key element of dangerous condition liability under the TCA is that a plaintiff must prove that the public entity's failure to protect against the danger was "palpably unreasonable." The term "palpably unreasonable" is not defined in the Act. The Supreme Court in Kolitch, 100 N.J. at 493, explained that "the term implies behavior that is patently unacceptable under any given circumstance." The Court further stated in Kolitch that "it must be manifest and obvious that no prudent person would approve of [the public entity's] course of action or inaction." Kolitch, 100 N.J. at 493 (citation omitted).

The burden of proving a defendant acted in a palpably unreasonable manner is on the plaintiff. Coyne v. State, Dept. of Transp., 182 N.J. 481, 493

22

(2005). The palpable unreasonableness of an entity's conduct is ordinarily a fact question for the jury, Vincitore v. Sports & Expo. Auth., 169 N.J. 119, 130 (2001). However in "appropriate circumstances," the question may be decided by the court as a matter of law, upon an application for summary judgment. Polzo v. Cty of Essex, 209 N.J. 51, 75 n.12. (2012).

Although it is not expressly mentioned in the TCA, a plaintiff claiming negligence by a public entity also must show the alleged negligence was a proximate cause of his or her injury. Proximate cause is "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." Daniel v. State, Dept. of Transportation, 239 N.J. Super. 563, 595 (App. Div. 1990) (quoting Polyard, 160 N.J. Super. at 511).

Ordinarily, "the issue of proximate cause should be determined by the factfinder." Fluehr v. City of Cape May, 159 N.J. 532, 543 (1999). However, the causation issue "may be removed from the factfinder in the highly extraordinary case in which reasonable minds could not differ[.]" Ibid. (emphasis added) (citing Vega by Muniz v. Piedilato, 154 N.J. 496, 509 (1998)). No single proximate cause must be identified. "[T]here may be two or more

concurrent and directly cooperative and efficient proximate causes of injury." Menth v. Breeze Corp., 4 N.J. 428, 442 (1950).

B.

When applying these TCA liability standards to our appellate review in this case, we must adhere to the fundamental principles that guide summary judgment motions in general. The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also R. 4:46-2(c). The court cannot resolve contested factual issues but instead must determine whether there are any genuine factual disputes. Brill, 142 N.J. at 540. If there are materially disputed facts, the motion for summary judgment should be denied. Parks v. Rogers, 176 N.J. 491, 502 (2003); Brill, 142 N.J. at 540. To grant the motion, the court must find that the evidence in the record "'is so one-sided that one party must prevail as a matter of law.'" Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

These general standards under Rule 4:46 have been applied to public entity defendants seeking summary judgment in TCA cases. To succeed on a

24

motion for summary judgment, the public entity must "come forward with proof of a nature and character which would exclude any genuine dispute of fact[.]" Ellison v. Housing Auth. of South Amboy, 162 N.J. Super. 347, 351 (App. Div. 1978). Once the public entity has met that burden, summary judgment is warranted and, indeed, desirable, as a matter of judicial economy. Kolitch, 100 N.J. at 497.

On appeal, we review a trial court's ruling on a summary motion de novo, applying the same legal standards that govern such motions at the trial level. See, e.g., Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 349-50 (2016).

III.

A.

Before we address the State's potential liability for a dangerous condition under N.J.S.A. 59:4-2, we first briefly comment on two TCA immunities the motion judge did not rest upon in his summary judgment decision.

First, the State notably has not invoked the immunity in N.J.S.A. 59:4-6 for injuries arising from the "plan or design of public property." A critical requirement of that immunity is the defendant's proof that the construction or improvement at issue was built in conformity with plans or design standards approved by an official body of its designee. Manna v. State, 129 N.J. 341, 352-

59 (1992). No such plans or approved design standards were presented by the State here, which explains why it has not invoked this particular immunity.

The State did attempt to persuade the motion judge that the sign-placement aspects of this case are shielded from liability under N.J.S.A. 59:4-5. That provision recites that a public entity is not liable "for an injury caused by the failure to provide ordinary traffic signals, signs, markup or other similar devices." Ibid. (emphasis added). This is not a case, however, in which the State failed to "provide" a traffic sign. Instead, it is a case in which the stop sign that was provided was placed (or, apparently moved to) what plaintiff and her expert allege is the wrong side, contrary to MUTCD Section 2B.10.

We acknowledge the State's argument that MUTCD affords government agencies the discretion to choose to locate a stop sign on the left side of certain roadways, in "some circumstances." See MUTCD § 2A.16. However, the State has produced no documents or other evidence that any decision-maker exercised discretion, based on any engineering judgment, to situate this particular stop sign against customary driver expectations, on the opposite side. See MUTCD § 1A.09 (requiring the exercise of engineering judgment).[13]

---

[13] We need not resolve in this opinion whether the sign immunity in N.J.S.A. 59:4-5 is confined to situations in which the public entity's failure to install a sign is the result of governmental discretion. We do note that the one case cited

Furthermore, to the extent the State and its expert Schorr contend the stop sign here was in an allowable location on the left side, plaintiff's theory of liability also includes a claim that the sign was not adequately illuminated because five of the six lights in the ramp had burned out and were not replaced. That essentially is a claim of a failure of maintenance. As case law makes clear, once a public entity decides to install a traffic device or signal, it has a duty to maintain it. Shuttleworth v. Conti Construction Co., 193 N.J. Super. 469, 472-73 (App. Div. 1984). For example, such failures of maintenance logically can include the failure to trim bushes that make the sign hard to see, or, as here, the failure to maintain lighting that enables the sign to be visible at night. The entity's failure to maintain a traffic sign is not immunized under N.J.S.A. 59:4-5, but instead must be evaluated under the dangerous condition elements of N.J.S.A. 59:4-2. Civalier by Civalier v. Estate of Trancucci, 138 N.J. 52, 63 (1994).

---

in the State's brief on sign immunity, Patrick by Lint v. Elizabeth, 449 N.J. Super. 565 (App. Div. 2017), concerned a situation in which a City exercised its discretion to not install an optional additional "school zone" sign in front of a park a block away from an elementary school. See also Hoy v. Capelli, 48 N.J. 81, 90 (1966) (noting, in a pre-TCA case, the government's discretion in exercising judgment over signage decisions).

B.

We now turn to those elements of dangerous condition liability. Having reviewed the record in a light most favorable to plaintiff, we respectfully differ with the motion judge, and conclude that plaintiff has presented genuine issues of fact that enable her to present her claims to a jury.

First, there is plenty of credible evidence that the ramp location was in a dangerous condition on the evening of the accident. Plaintiff and the two police officers – neither of whom has any reason to take a side in this civilian's lawsuit – emphatically have testified the "chute" was "pitch dark" and "dangerous." Five of the six lamps were burned out. The stop sign was on the non-customary side of the roadway. As Officer Puente bluntly stated at his deposition, the lighting was "very poor," the ramp was "very dark," and "my heart goes out to this [plaintiff]." Although the State's expert Schorr contends the visibility was adequate and that Thomas had sufficient time to react and brake to a stop, a jury reasonably could reject his opinions and adopt the contrary opinions of Hanscom. Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 85-86 (App. Div. 1961). As illustrated by the competing experts, there is plainly a jury question here on the presence or absence of a dangerous condition.

Next, our de novo review reveals that there are also sufficient indicia of actual or constructive notice to the State of the dangerous nature of the roadway at this location. Although plaintiff presents no witness establishing actual notice, there is a reasonable basis for a jury to find the State had constructive notice of the hazard. As Officer Puente testified, "[t]he one thing that stood out [at the scene] was one light on. All the other lights were out." (Emphasis added). Such testimony reflects the "obvious nature" of the dim lighting hazard. See N.J.S.A. 59:4-3(b). Moreover it stands to reason that not all five non-working lights all burned out on the same day. It is far more probable that the lights burned out in succession over a period of time.

The police reports plaintiff obtained from the municipality documenting 126 previous accidents at this location also can supply an evidential basis for actual or constructive notice of the dangerous character of this portion of the roadway. To be sure, plaintiff will need to show at trial that these previous accidents, or at least some of them, arose in comparable circumstances. See Wymbs v. Twp. of Wayne, 163 N.J. 523, 537 (2000); see also Wooley v. Bd. of Chosen Freeholders, Monmouth Cty., 218 N.J. Super. 56, 62-63 (App. Div. 1987) (finding evidence of previous accidents sufficient to raise material issues of fact as to the public entity's notice of the dangerous roadway condition).

Further arguable support for plaintiff's claim of notice to the State stems from the fact that the State routinely collects all completed New Jersey Police Crash Investigation Reports statewide from state and local law enforcement agencies. [14] Although we appreciate these reports are voluminous, the considerable number of accidents at this particular location lends credence to plaintiff's contention that the State should have been aware of the preexisting hazard at this location, and have done something about it.

We are further satisfied the circumstances in this case could reasonably be deemed by a jury to rise to the level of "palpably unreasonable" conduct. The motion judge is correct that no one knows exactly how long various lights at this spot were not illuminated, but viewing the record in a manner most favorable to the plaintiff, the dim lighting in the ramp could reasonably be considered a major

[14] The DOT's website reflects that its Bureau of Transportation Data and Safety collects all New Jersey Police Crash Investigation Report forms statewide, from state and local law enforcement agencies. State of N.J. Dep't of Transp., Crash Records Overview, https://www.state.nj.us/transportation/refdata/accident/. In addition, N.J.S.A. 39:4-131 requires: "[e]very law enforcement officer who investigates a vehicle accident of which report must be made as required in this Title, or who otherwise prepares a written report as a result of an accident or thereafter by interviewing the participants or witnesses, shall forward a written report of such accident to the [New Jersey motor vehicle] commission . . . within five days after his investigation of the accident." A reportable accident is defined as any accident "resulting in injury to or death of any person, or damage to property of any one person in excess of $500.00." N.J.S.A. 39:4-130.

hazard. It is also unclear when and why the stop sign was moved from the right to the left side, which again reasonably can be regarded as a serious problem. The other criticisms raised by plaintiff's expert Hanscom, such as the need for retro-reflective curbing, also might contribute to the severity of the hazard and the State's failure to guard against it.

The element of proximate cause also poses a legitimate jury question. The motion judge correctly recognized that plaintiff does not remember the moment of the crash. But she did provide cogent and vivid deposition testimony about the condition of the chute, and the motorcycle's operation before that point of impact. Thomas may well have been a major – perhaps the primary – cause of the accident, but a reasonable jury could determine that the condition of the dimly-lit roadway was a "substantial factor" in producing it. Although Thomas was apparently served a traffic summons, no fact witness asserts that he was speeding. This is not the "highly extraordinary case" in which the issue of proximate causation should be taken away from the jury. Fluehr, 159 N.J. at 543.

In sum, we conclude the motion judge erred in dismissing plaintiff's claims with prejudice. We are mindful the motion judge seems to have been unaware his colleague had extended discovery that very same day, and perhaps

there was confusion about whether the additional materials tendered by plaintiff were appropriately part of the summary judgment record. Even so, plaintiff is entitled to all reasonable inferences in her favor based on the full record.[15]

Lastly, we disagree with the motion judge's incidental determination that Hanscom's expert reports comprised inadmissible "net opinion." It is plain from the expert's three detailed reports that he provided sufficient "whys and wherefores" for his opinions. See Buckley v. Grossbard, 87 N.J. 512, 524 (1981). Moreover, Hanscom cites to and relies upon objective standards of care in the traffic safety field, such as the MUTCD. His opinions are not based on purely personal standards. Cf. Townsend v. Pierre, 221 N.J. 36, 53 (2015). Moreover, to the extent the motion judge faulted Hanscom for not initially performing a site visit, that omission was cured by the site visit he conducted in

---

[15] We take no position as to whether the accident reports tendered by plaintiff will be admissible at trial and whether plaintiff should be barred from making use of them due to any alleged discovery violation. The discovery order was not cross-appealed, and any issues of admissibility should be resolved on remand by the trial court in the first instance, ideally preceded by an accident-by-accident proffer of relevance from plaintiff. Of course, the trial court has the discretion to extend discovery further to give the defense an opportunity to explore the prior accidents in more depth and develop any counterproof concerning them. Indeed, there were about five weeks still left in the extended discovery period when the motion judge dismissed the case.

A-2596-16T4

mid-October 2016 and his supplement report which plaintiff served thereafter within the extended discovery period.

Summary judgment is consequently vacated and the matter is remanded for trial and any further permitted discovery. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2596-16T4